Mr. Justice CATRON
 

 delivered the opinion of the court.
 

 1. On the facts appearing in the record, a motion was made to dismiss the suit for want of jurisdiction, because it was brought here by appeal, .wdiich brings before the revising court all the evidence; whereas, had a writ of error been brought, such parts of the evidence only could have been considered as were presented by bills of exception. This motion has been held up for a length of time, and is now considered with the merits, and the inquiry standing in advance of the merits is,, whether the appeal shall be dismissed. The suit was commenced in a State District Court according to a prescribed form of practice in Louisiana, and removed by the defendant from the State court to the Circuit Court of the United States, where the same mode of pleading and practice was necessarily pursued that would have been, had the cause continued in the State court, and been there adjudged; it therefore comes here as an anomalous case.
 

 The proceeding was commenced by Lapice and Whittlesey; they asked to have .a cloud removed from their title, which they alleged was embarrassed by a pretended and illegal claim' of Surgett to a back concession, of anterior date to their title, and for the same land. Surgett came in, and set forth his' claim; it was purely equitable in its character, in the sense of the term.
 
 “
 
 equity,” as denominated in the Constitution and acts of Congress; this claim Surgett, (by a petition in his' answer,) by way of reconvention, asked to have enforced against Lapice and Whittlesey. He thereby became complainant. The character of Lapice and Whittlesey’s title is not in controversy; both sides admit that it is a legal and valid title on its face, and as against the United States indisputable; but Surgett sets up a right of preference to entry of the same land at the time when the entries were made under which Lapice and Whittlesey claim, and the question is, how was the Circuit Court to deal with the matter when an appeal or writ of error was demanded, as the one or the other the judge was compelled to allow; he was called on for a decree by
 
 *65
 
 each party, as on bill and cross-bill in an ordinary chancery proceeding, and did decree that Lapice and Whittlesey should be quieted in their title to, and possesion of, the land in controversy, and that Surgett should be for ever enjoined from setting up any claim or pretension to the same; and so he might have decreed the other way; and although, by the laws of Louisiana, a jury might have been called in a State court to aid in ascertaining the facts, yet as none' was required by the parties in the Circuit Court, and the cause was heard by the court alone, and a decree rendered, we think the mere fact that a State court might employ a jury does not affect the character of the proceedings actually had in the Circuit Court. In other States, juries are frequently employed by the chancellors when hearing causes, as in Kentucky, where it is required by a statute; yet if an ordinary suit in equity was removed from a State court to the Circuit Court (Unjted States), in a district where, by the State statutes, a jury was required to find contested facts; still the Circuit Court would not be required to resort to a jury, nor could it do so. And we take occasion here to say, that, had the Circuit Court submitted the cause to a jury in this instance, we should have deemed it improper, although demanded by either side. Our opinion, therefore, is, that there was litigated in the Circuit Court a mere equitable title, in a form impressed on the proceeding in a State court, and a decree pronounced as a court of equity would have done in a regular course of proceeding in chancery; and that the merits of the cause could only be reviewed on appeal.
 

 But as several cases have been dismissed from this court because they were brought here by appeal instead of a writ of error, it 'is insisted that this rests on. the same grounds of those that have been dismissed, and the case of the United States
 
 v.
 
 King (3 and 7 How. 773 and 844) has been much relied on to show that this cause cannot be brought here by appeal. But that was not an action of title to quiet the plaintiff in possession of his land, but was a petitory action brought by the United States to recover land which was in the possession of the defendant, and to which the United States claimed a legal title. The suit was in the nature of an ejectment in a court of common law, and was therefore strictly an action at law, and in no respect analogous to a proceeding in equity to remove a cloud from the title of a party who not only holds the legal title, but is also actually in possession of the land in dispute; and as the United States cannot be sued in reconvention, if the defendant had claimed an equitable title in that case, it would have been no defence,
 
 *66
 
 because he could not make the United States a defendant, and himself a plaintiff, by a suit in reconvention. The whole proceedings were necessarily proceedings at law, and could therefore be removed by writ of error only, and not by appeal. And substantially of the same character were all. the cases relied on by counsel to dismiss this appeal; none of them resembled the case before us in any material degree, — certainly not enough to govern it, — and the jurisdiction is consequently sustained.
 

 •2. We come in the next place to discuss the merits ; and here some general considerations present themselves. Ou the first settlement of Lower Louisiana, the nature of the country imposed on the governments who successively held it a peculiar policy in granting land to individual proprietors ; the Mississippi River overflowed its banks annually, and to overcome this impediment to cultivation, and to’ reclaim the back lands, heavy embankments had to be thrown up on the sides of the river, so as to keep the water at flood-tide within the channel ; and these embankments had to be connected and continuous for a gre_at distance, otherwise the' whole country would be submerged ; and the king’s domain was resorted toms a means of securing the country from overflow, aird of reclaiming it to a great
 
 extent;
 
 and individual proprietors-were relied on to do that which, in other countries at all similarly situated, was a great national work: and it is matter of surprise how much the policy accomplished with such feeble, and questionable means. The grants were not large, find fronted on the river only to the extent of from two to eight arpens as a general rule, and almost uniformly extended' forty arpens
 
 back;
 
 to these front gi-ants the Spanish government reserved the back lands, to another depth of forty arpens; and although few if any grants were made of back lands in favor of front proprietors, still they were never granted by the Spanish government to any other proprietor, but used for the purpose of obtaining fuel and for pasturage by the front owners, so that, for all practical purposes, they were the beneficial proprietors; — subject to the policy of levees, and of guarded protection to front owners. We took possession of Lower Louisiana in 1804. In 1805, commissioners were appointed, according to an act of Congress, to report on the French and Spanish claims in that section of country, and by the act of April 21st, 1806, it was made a part of their duty to inquire into the nature and extent of the claims which may arise from a right, or supposed right, to a double or additional concession on the back of grants or concessions heretofore made,” previous to the transfer of
 
 *67
 
 government, “and to make a special report thereon'to the Secretary of the Treasury, which report shall be by him laid before Congress, at their next ensuing session. And the lands which may be embraced by such report shall not be otherwise disposed of, until a decision of Congress shall have been had thereoii.”
 

 . The commissioners were engaged nearly six years in the various and complicated duties imposed on them, and then reported, that, by the laws and usages of the Spanish government, no front proprietor by his own act could acquire a right to land farther back than the ordinary depth of forty arpens, and although that government invariably refused to grant the second depth to any other than the front proprietor, yet nothing short of a grant or warrant of survey from the Governor could confer a title or right to the land ; wherefore they rejected claims for the second depth, as not having passed as private property to the front proprietor under the stipulations of the treaty by which Louisiana was acquired. As by the Spanish policy and usages the front owner had reserved to him a preference to become the purchaser of the second depth, Congress by the fifth section-of the act of March 3, 1811, provided that every person who “ owns a tract of land bordering on any river, creek, bayou, or water-course,” in the Territory of Orleans, “ and not exceeding' in depth forty arpens, French measure, shall be entitled to a preference in becoming the purchaser of any vacant tract of land adjacent to, and back of, his own tract, not exceeding forty arpens, French measure, in depth, nor in quantity of land that which is contained in his own tract, at the same price, and on the same terms and conditions, as are, or may be, provided by law for -the other public lands in the said Territory.” And inasmuch as the country had not to any material extent been prepared for sale in the ordinary mode by public surveys, it was made the duty of the principal deputy surveyor of each of the two districts in the Orleans Territory, to cause to be surveyed the preference rights claimed under the act; and where, by reason of bends in the river, bayou, creek, or water-course on which a front tract bordered, and where there were similarly situated tracts, so that each claimant could not obtain a quantity equal to his front grant, it was made the duty of the surveyor to divide the vacant land between the several claimants in such manner as to him might appear most equitable. To gratify preemption claims secured by the act, no township surveys in advance of an entry were contemplated, as they could not be regarded did they exist; and as the act was limited to three years’ duration,
 
 *68
 
 little of the country was likely to be surveyed before the time for making entries expired. By the seventh section of the act of May 11, 1820, the fifth section of the act of March 3, 1811, was renewed, and continued in force until May 11, 1822: and by the'Set of June 15, 1832, the act of 1811 was again renewed for three years, with some slight amendments; and by the act of February 24, 1S35, the time was further extended to June 15, 1836.
 

 The township where the land in dispute is situated was offered for sale, according to the President’s proclamation, in November, 1829 ; and as Surgett first offered to make his entry in 1836, it is insisted that, after the lands in the township were offered at public sale, no entry founded on a preference right was allowable at the land office ; and such was the opinion of the court below, and is one of the reasons assigned for rejecting Surgett’s claim. The act of 1S32 provides, that the claimant shall deliver his notice of claim to the register of the proper land office, stating the extent and situation of the tract he wishes to purchase, and shall make payment; but it has this proviso, — that all notices of claim shall be entered, and the money he paid thereon, at least three weeks before such period as may be designated by the proclamation of the President for the sale of the public lands in the township where such claim may be situated; and- all claims not so entered shall be liable to be sold as other public lands. The proviso was an exception to a general law giving a right of entry; it was prospective, having reference to future public sales, and not to lands that had' been previously offered, and remained unsold ; Surgett could not comply with the condition, nor had it any application to such a case as his claim presents.
 

 The manifest object of Congress was to disembarrass public sales by barring preference rights that would be a cloud on the-title of lands thus offered.
 

 The foregoing construction being tin* one adopted by the departments of public lauds soon aftet tin act of 1832 went into operation, we should feel ourselves restrained, unless the error of construction was plainly manifest, from disturbing the practice prescribed by the Commission!-: of the General Land Office, acting in accordance with the opinion of the Attorney-General, and which had the sanction of the Secretary of the Treasury and of the President of the United States.
 

 The court below rejected SurgctCs claim to enter the back land on another ground. The acts of -Congress securing the preference contain an exception,— 'Ghat the right of preemption shall not extend so far in dc” s-i a-i ¡o include lands fit for
 
 *69
 
 cultivation bordering on another river, creek, bayou, or watercourse.” And the question is, To what' description of watercourse did the legislature refer? The enacting clause provides that every person who owns a tract of land “bordering” on any river, creek, bayou, or water-course, shall have the right of preemption to the back land. The act of 1811 has been construed, in the department of public lands, for nearly forty years, to mean that those owner¿-whose lands fronted on a navigable stream were only provided for; and that the word “border,” both in the enacting clause and in the exception, meant to front on a navigable water-course; that -is to say, such waters as are described in the third section of the act of February 20, 1811, by which Louisiana was authorized to form a State constitution and government, by which act the River Mississippi, and the navigable rivers and waters leading into the same, or into the Gulf of Mexico, were declared to be common highways, and for ever free, as well to the inhabitants of the said State, as to other citizens of the United States.
 

 Similar provisions as respects navigable waters are common to other States where there are public lands, aud the practice has been uniform to survey and sell the lands “ bordering ” on navigable streams as fractional sections; nor is the channel ever sold to a private owner. Of necessity, it had to be left almost exclusively to the department of lauds executing the public surveys to ascertain what stream was navigable, and should be bordered by fractions and reserved from sale; and, on the other hand, what waters were not navigable, and should be included in square sections, and the channel sold. The registers and receivers were bound by recorded returns of the surveyors, (as a concluded fact,) to- sell according to the surveys, nor could the register and receiver be allowed to hear evidence contradicting the surveys, as to-whether the waters included by them were or were not navigable. Subject to this state of the law, Surgett offered (20th May, 1S36) to enter the back land to front numbers 2S, 29, 30, 31, 32, and 33 ; making 989y-|}o- acres, which lots adjoin, and were included in one patent, together with two other lots, Nos. 3-1 and 35, also adjoining on the south, to which he did not claim any back laud ; that is to say, ho claimed 989x'j-u- acres as a back concession to a patent of l,30Sr-fro acres, so as to extend the six lots first named ; and if neither the bayou, nor the existence of previous entries, stood in the way, he had a clear right to enter. Sparrow and Whittlesey’s entries were in part fractions, not, however, produced by having bordered on a stream, but because they adjoined front lots on the Mississippi River not surveyed
 
 *70
 
 in squares, but according to the second section of the act of March 3, 1811.
 

 In surveying township number five, the Mill Bayou was entirely disregarded, and the surveys of sections and quarter-sections were made in rectangular figures, and laid down and sold across that water, the channel of which was granted in part to Sparrow and Whittlesey, and in part to others. According to the rules, therefore, by which the register and receiver were governed, they had no right to refuse Surgett’s entry for the reason that the land bordered on another navigable stream.
 

 How far the powers of. the court below extended to contradict the public surveys and records of the land office, we refrain from discussing in this case,-as the parties on the one side and on the other affirmatively appealed to a court of justice to decide the fact, whether the bayou was of the description contemplated by the acts of Congress, and a water-course on which lands could front. It is between two and three miles long, and drains swamps, and a shallow pond, or rather lagoon; its greatest width is from seventy to eighty feet from bank to bank, and the channel in part is gome fifteen feet deep from the top of its banks; but at no time of the year has it any claims to be a navigable stream, being nearly dry for a greater portion of the year, having no running water, or any water in it, except stagnant pools; it is an ordinary drain of the Mississippi swamp, and of shallow ponds. Near its mouth, at the Mississippi River, there is a levee, — and so there-is one-near to the pond, at its farther end from the fiver; both levees being on lands granted to Surgett. Before the lower levee was constructed, there had been a mill for grinding erected on the bayou, which gave it the name it bears; the flow of water was then from the Mississippi River through this outlet to the swamp, in times when the river was high. But it was never fit for any purpose, as a channel through which commerce c'ould be carried on by water. The ground of defence must therefore fail, that the lands entered by Sparrow and Whittlesey bordered on a bayou, and were within the exception of the act of 1832.
 

 The Circuit' Court also held that the back land was proved to be fit for cultivation, and being so, was excepted from the enacting clause giving a preference of entry. The exception is, “ that the right of preemption shall not extend so far in depth as to include lands fit for cultivation bordering on another river, creek, bayou, or water-course.” There is no break in the sentence, and we hold that Congress clearly intended to make a single exception, whereas the court below divided the
 
 *71
 
 clause cited into two exceptions; excluding a preference right, first, if a bayou, &c. intervened; and, secondly, if the land was fit for cultivation, whether there was a navigable water in its rear, or not.
 

 We only deem it necessary on this head to say, that, from 1811 to this time, the general land office has construed the exception as being single, requiring that the back land should border on another navigable stream; and also, that it should be fit for cultivation, before the preference of entry could be denied ; and we take occasion here to declare, that, unless this uniform construction for so long a time by the land department was most manifestly wrong, we should not feel ourselves at liberty to disturb it, as, by doing so, titles might be shaken, and confusion produced.
 

 For the reasons stated, it is ordered that the decree of the Circuit Court be reversed, and that the cause be remanded to that court, with directions to enter a decree for the plaintiff in reconvention, Surgett; and that court is directed to cause a survey to be made under its supervision, laying off the back land to lots Nos. 28, 29, 30, 31, 32, and 33, according to the practice in use in like cases in the surveyors’ offices in Louisiana. And it is further ordered, that said Surgett may be decreed to be the legal owner of said land, to the extent that the lands of said Peter M. Lapice and the heirs of Edward Whittlesey interfere with a survey legally made of said back lands; and that said Lapice and the representatives of said Whittlesey be decreed to convey to said Francis Surgett such parts of the lands included in the survey as are embraced by any of the entries or patents set forth in the original petition of said Lapice and Whittlesey ; and that said Surgett may be quieted in his title and possession of the lands hereby decreed. And it is further ordered, that said Lapice and Whittlesey’s representatives recover from said Francis Surgett after the rate of one dollar and twenty-five cents per acre, for all the land that they are deprived of by this decree, with interest on said sum after the rate of five per centum per annum from the 10th day of May, 1836, until paid; and that said amount shall be ordered to be paid forthwith into court, subject to the order of said Lapice and Whittlesey’s representatives; nor shall said decree be executed until the money is paid. And it is further ordered, that said Lapice and Whittlesey’s representatives shall pay the costs of the appeal to this court; but that the costs of the Circuit Court, which have already accrued, aud such as may hereafter accrue, shall be adjudged by the court below, on a future hearing, as law and justice may require. And it is further ordered, that in
 
 *72
 
 all matters that may arise in said canse, and in respect to which no special directions are given by this decree, the Circuit Court shall proceed according to the law and equity of the various matters presented, without being restrained by this decree.
 

 Order.
 

 This cause came on to be heard on the transcript of the record of the Circuit Court of the United States for the District of Louisiana, and was argued by counsel. On consideration whereof, it is ordered, that the decree of the Circuit Court be reversed, and that this cause be remanded to that court, with directions to enter a decree for the plaintiff in reconvention, Surgett; and that court 'shall cause a survey to be made under its direction, laying off the back land to lots Nos. 28, 29, 30, 31, 32, and 33, according to the practice in use in like cases in the surveyors’ offices in Louisiana. And it is further ordered, that said Surgett may be decreed to be the legal owner of said land, to the extent that the lands of said Peter M. Lapice and the heirs of Edward Whittlesey interfere with a survey legally made of said back lands, and that said Lagice and the representatives of said Whittlesey be decreed to convey to said Francis Surgett such parts of the lands included in the survey as are embraced by any of the entries or patents set forth in the original petition of said Lapice and Whittlesey ; and that said Surgett may be quieted in his title and possession of the lands hereby decreed. And it is further ordered, that said Lapice and Whittlesey’s representatives recover from said Francis Surgett after the rate of one dollar and twenty-five cents per acre for all the land that they are deprived of by this decree, with interest on said sum after the rate of five per centum per annum, from the 10th day of May, 1S36, until paid; and that said amount shall be ordered to be paid forthwith into court, subject to the order of said Lapice and Whittlesey’s representatives ; nor shall said decree be executed until the money is paid. And it is further ordered, that said Lapice and Whittlesev’s representatives shall pay the costs of the appeal to this court; but that the costs of the Circuit Court which have already accrued, and such as may hereafter accrue, shall be adjudged by the court below, on a future hearing, as law and justice may require. And it is further ordered, that in all matters that may arise in said cause, and in respect to which no special directions are given by this decree, the Circuit Court shall proceed according to the law and equity of the varkms matters presented, without being restrained by this decree.