UNITED STATES v. SCHEURER.

No. 1162.

District Court, D. Oregon.

March 20, 1944.          *a*

Carl C. Donaugh, U. S. Atty., and J. Mason Dillard, Asst. U. S. Atty., both of Portland, Or., for plaintiff.

B. G. Skulason, of Portland, Or., for defendant.

JAMES ALGER FEE, District Judge.

A complaint for the cancellation of a certificate of naturalization, issued after the administration of an oath in this court to John Hans Scheurer on July 19, 1934, was brought by the United States under the provisions of the Act of 1940.[1] After the issues were segregated by pre-trial conference and crystalized by order thereon, a trial was had. The evidence showed the defendant was a sheetmetal worker who came to this country from Germany in 1923. He had been a member of the armed forces of Germany and fought in the first World War as a private and then as an officer, receiving a promotion for bravery in the field. After the war he had become a member of the Stahlheim in Germany.

Upon coming to this country Scheurer joined a German Veteran's Association in Portland, Oregon. In March 1934, he filed a preliminary form for petition for citizenship and in April 1934, a statement of facts to be used in filing a petition for citizenship. His petition was filed. He was given what is described as a routine examination at the time of, and after the filing of, the petition for citizenship, by the examiners who, at that time, were employees of the Bureau of Naturalization, Department of Labor. His witnesses, also, were examined under oath. The chief object of these examiners was to establish the residence of petitioner for the required length of time, his knowledge as to the form of government of the United States, and the absence of a criminal record. Admittedly, in the case of Scheurer, when no criminal record was found, the examination was perfunctory. No further investigation was made in his case to check the validity of his other statements. On July 19, 1934, Scheurer was brought before this very court, to-

[1] 8 U.S.C.A. § 738, Act of October 14, 1940, c. 876, Title I, Subchapter III, § 338, 54 Stat. 1158 derived from Act of June 29, 1906, c. 3592, § 15, 34·Stat. 601; May 9, 1918, c. 69, § 1, 40 Stat. 544.

gether with a number of persons who expected to be naturalized, where the writer of this opinion was presiding. Mr. Thomas S. Griffing, one of the examiners, stated that a group of persons standing in the court, were citizens of the German Reich who had been examined as to their knowledge of government and found satisfactory and were recommended for admission.

No statement was made to whom they were found satisfactory.[2] Neither the petition of Scheurer nor any other applicant, nor any other supporting documents thereto, nor records as to the examination, were brought before the court. No examination was made of Scheurer or his witnesses or any other applicant or other person by or in the court. The court did not have before it the approved form of recommendation containing the name of Scheurer and the other applicants until it was brought up with the printed form of order for admission for signature.

After hearing the statement of the examiner, the court directed the clerk to administer the oath of citizenship to the persons before him, as a group. Thereafter, the applicants left the courtroom and respectively signed a certificate of naturalization in the clerk's office. Later there was brought to the Judge in chambers, the recommendation of the examiner, the text of which was as follows:

"Form 2351     Original
U. S. Department of    Date July 19, 1934
Labor Naturaliza-     List No.   89
tion Service         Sheet No. 2

"Naturalization Petitions Recommended To Be Granted

"To the Honorable the District Court of the United States for the District of Oregon, sitting at Portland, Ore. (Division..):

"The undersigned, duly designated under the Act of June 8, 1926 (Public No. 358, 69th Cong.), to conduct preliminary hearings upon petitions for naturalization to the above-named Court and to make findings and recommendations thereon, has personally examined under oath at a preliminary hearing each of the following Five (5) petitioners for naturalization and their required witnesses, has found each

of such petitioners entitled under the law to be naturalized, and therefore recommends that each such petition, upon the appearance of the petitioner in open Court, be granted, including prayer for change of name where noted below.

| No. | Petn. No. | Name of Petitioner | Change of Name |
|---|---|---|---|
| 1 | 8643 | Assimina Voltis | Mina Voltis |
| 2 | 8644 | Joe Provenzana | |
| 3 | 8645 | John Scheurer | |
| 4 | 8760 | Elo Roald Tollefsen | |
| 5 | 8559 | Charles Eugene Mc-Killop | |

\*   \*   \*   \*   \*   \*   \*   \*   \*

"Respectfully submitted:
"Date July 19, 1934

          "Thos. S. Griffing
          "(Signature of designated
            examiner or officer)
"United States of America
   District of Oregon    ss
Portland, Oregon   Division
"Upon consideration of the petitions for naturalization listed above, and the findings and recommendations thereon of a duly designated examiner or officer of the Bureau of Naturalization (or Naturalization Service), and each of the said petitioners having appeared in person at a final hearing held in open Court this 19 day of July, A. D. 1934, and having taken the oath prescribed by law, it is hereby ordered that each of the petitioners so listed be, and hereby is, admitted to become a citizen of the United States of America, and, the prayer granted for change of name in petition No. 1643.
By the Court:
          "James Alger Fee
           "Judge.
"Government Printing Office 14–2358
"Endorsed:
"Filed July 19, 1934
"G. H. Marsh, Clerk
"By A. M. Salvon, Deputy"

Although the "final order" administratively prescribed, which is attached to this form of petition, recited that the judge had considered the "findings" of the designated examiner, there is no adoption thereof. The words "found each of the petitioners entitled under the law to be naturalized" states no fact found. It is a bare conclusion of law. The judge signed the form and admitted Scheurer upon the statement

---

[2] In the suggestion of the Committee on American Citizenship of the American Bar Association, it is indicated that at present they must be found satisfactory to the Department of Justice. Gateway to Citizenship 1943, pp. 116–117, citing 8 U.S.C.A. § 707, which is former § 382, 8 U.S.C.A.

that the examiner had found Scheurer satisfactory and the recommendation for admission.

There are several questions to be decided here. First, had this court, by approving recommendations of a designated examiner at the naturalization proceeding, passed upon and thereby rendered res judicata the qualifications of the applicant for citizenship, including the proposition of behavior indicating attachment to the principles of the Constitution for five years prior thereto, so that no actual examination of these facts can be had in this proceeding? Second, if this question is open for examination, had the defendant behaved as a person so attached and had he actually been so attached? Third, did defendant commit a fraud upon the court by taking a false oath when he swore that he was attached to the principles of the United States Constitution?

At the threshold, the effect of the recent decision of the Supreme Court in the case of United States v. Schneiderman[3] upon the principles underlying the present controversy must be determined. It is contended that the first question, above propounded, has been settled thereby and that it was held that no examination may be had of the behavior of the defendant within five years prior to primary admission, because a "judgment" was passed by the court in the "final order" which conclusively establishes the basic facts against attack direct or collateral. The majority opinion of the court in that case speaks in part as follows:

"We are dealing here with a court decree entered after an opportunity to be heard. At the time petitioner secured his certificate of citizenship from the federal district court for the Southern District of California notice of the filing of the naturalization petition was required to be given ninety days before the petition was acted on (§ 6 of the Act of 1906), the hearing on the petition was to take place in open court (§ 9), and the United States had the right to appear, to cross-examine petitioner and his witnesses, to introduce evidence, and to oppose the petition (§ 11). In acting upon the petition the district court exercised the judicial power conferred by Article III of the Constitution, and the Government had the right to appeal from the decision granting naturalization. Tutun v. United States, 270 U.S. 568, 46 S.Ct. 425, 70 L.Ed. 738. The record before us does not reveal the circumstances under which petitioner was naturalized except that it took place in open court. We do not know whether or not the Government exercised its right to appear and to appeal. Whether it did or not, the hard fact remains that we are here re-examining a judgment, and the rights solemnly conferred under it."[4]

Mr. Justice Douglas, concurring, says in part:

"The findings of attachment are entrusted to the naturalization court with only the most general standard to guide it. That court has before it, however, not only the applicant but at least two witnesses. It makes its appraisal of the applicant and it weighs the evidence. Its conclusion must often rest on imponderable factors. In the present case we do not know how far the naturalization court probed into petitioner's political beliefs and affiliations. We do not know what inquiry it made. All we do know is that it was satisfied that petitioner was 'attached to the principles of the Constitution of the United States.' But we must assume that that finding which underlies the judgment granting citizenship (Cf. Tutun v. United States, 270 U.S. 568, 46 S.Ct. 425, 70 L.Ed. 738) was supported by evidence. We must assume that the evidence embraced all relevant facts since no charge of concealment or misrepresentation is now made by respondent. And we must assume that the applicant and the Judge both acted in utmost good faith.

"If the applicant answers all questions required of him, if there is no concealment or misrepresentation, the findings of attachment cannot be set aside on the grounds of illegality in proceedings under § 15. It does not comport with any accepted notion of illegality to say that in spite of the utmost good faith on the part of applicant and judge and in spite of full compliance with the express statutory conditions a certificate was illegally procured because another judge would appraise the evidence differently."[5]

Excerpts from the opinion of Mr. Justice Rutledge are as follows:

"If, seventeen years after a federal court adjudged him entitled to be a citizen, that judgment can be nullified and he can be stripped of this most precious right, by

---

[3] 320 U.S. 118, 63 S.Ct. 1333, 1335, 87 L.Ed. 1796.

[4] Emphasis supplied.

[5] Emphasis supplied.

nothing more than *reexamination upon the merits of the very facts the judgment established,* no naturalized person's citizenship is or can be secure. * * *

"For all that would be needed would be to produce some evidence from which any one of the federal district judges could draw a conclusion, concerning one of the ultimate facts in issue, opposite from that drawn by the judge decreeing admission. The statute does not in terms prescribe 'jurisdictional' facts. But all of the important ones are 'jurisdictional,' or have that effect, *if by merely drawing contrary conclusion from the same, though conflicting, evidence at any later time a court can overturn the judgment.* An applicant might be admitted today *upon evidence satisfying the court he had complied with all requirements.* That judgment might be affirmed on appeal and again on certiorari here. Yet the day after, or ten years later any district judge could overthrow it, on the same evidence, if it was conflicting or gave room for contrary inferences, or on different evidence all of which might have been presented to the first court. * * *

"That ignores the vital fact that it is *a judgment,* rendered in the exercise of the judicial power created by Article III, which it is sought to overthrow, not merely a grant like a patent to land or for invention."[6]

It will thus be seen that the language of the opinions is very broad and is apparently designed to have universal application. Analysis dissipates this impression. The super-structure cannot stand where there is no foundation of fact to bear the weight. The only matter under consideration by the court was the effect of a certificate of naturalization granted early in 1927. Each of the quoted opinions indicates implicitly that the writer visualized a proceeding where the court heard evidence and made findings. But it is patent that there was no testimony or evidence in that record as to what actually happened in the District Court for the Southern District of California at the time Schneiderman was admitted. The assumption runs through all of the opinions that the order granting citizenship was made after consideration by the judge of the testimony of the petitioner and his witnesses in open court at a hearing where the United States had the statutory power to appear, object and appeal. No

consideration was given to the amendments of 1926 and 1929, 44 Stat. 709, 45 Stat. 1512, to the basic statute, or to the utterly different procedure initiated thereunder. The entire system whereby the majority of the district courts of the United States simply approve recommendations of designated examiners and preside at the taking of the oath and the subsequent valedictory while the entire examination is carried on by administrative officers under policies dictated by executive departments, has been disregarded in the final observations of the court relating to a specific case, where the evidence contained no showing as to what the course of procedure was. It is true, that the proceeding at the basis of the Tutun case,[7] cited in the Schneiderman case, was a hearing of the petitioner and his witnesses in open court, for no other was permissible at that time. It is true that such a proceeding is possible in any district court today where the designated examiner recommends against admission. It is true also, there are still courts where an actual hearing is held in each naturalization case before the granting of a certificate and the United States has the opportunity to be heard therein. That this is the type of situation to which the opinions in the Schneiderman case refer, is apparent. Certainly no facts were there presented which would indicate that there were courts which had adopted the entirely different procedure which arises from the use of designated examiners authorized by the amendment of 1926. The opinions, therefore, would not be controlling in a case where the facts as to the hearings were otherwise than those assumed by the opinions in that court.

A resume of the history of these acts and their construction will serve to explain the situation. In 1906 there was adopted the basic statute of naturalization which provided for the admission of aliens after a final hearing where the applicant and the witnesses were "examined under oath before the court and in the presence of the court." This quoted phrase dovetailed with the following section which gave the United States the right to appear in such proceeding and "cross-examine the petitioner and witnesses produced in support of his position." As a part of the same statute and by Section 15 thereof, 34 Stat. 601, the United States was permitted to file an independent

---

[6] Emphasis supplied.

[7] Tutun v. United States, 270 U.S. 568, 46 S.Ct. 425, 70 L.Ed. 738.

proceeding for cancellation of certificates of citizens fraudulently or illegally procured.

In the case of Johannessen v. United States[8] it was held that Section 15 of the Act of 1906 was constitutional and it was said:

"Sound reason, as we think, constrains us to deny to a certificate of naturalization, procured ex parte in the ordinary way, any conclusive effect as against the public. Such a certificate, including the 'judgment' upon which it is based, is in its essence an instrument granting political privileges, and open like other public grants to be revoked if and when it shall be found to have been unlawfully or fraudulently procured. It is in this respect closely analogous to a public grant of land (Rev.Stat. § 2289, [43 U. S.C.A. § 161] etc.), or of the exclusive right to make, use, and vend a new and useful invention (Rev.Stat. § 4883 etc.). * * *

"The act does not purport to deprive a litigant of the fruits of a successful controversy in the courts; for, as already shown, the proceedings for naturalization are not in any proper sense adversary proceedings, but are ex parte and conducted by the applicant for his own benefit. The act in effect provides for a new form of judicial review of a question that is in form, but not in substance, concluded by the previous record, and under conditions affording to the party whose rights are brought into question full opportunity to be heard. * * *

"But the act under consideration inflicts no such punishment, nor any punishment, upon a lawful citizen. It merely provides that, on good cause shown, the question whether one who claims the privilege of citizenship under the certificate of a court has procured that certificate through fraud or other illegal contrivance, shall be examined and determined in orderly judicial proceedings. The act makes nothing fraudulent or unlawful that was honest and lawful when it was done."

In United States v. Ginsberg[9] the Supreme Court held, quoting the Johannessen case, that the failure to hold the final hearing in open court was fatal to the proceeding and that the certificate could be voided. An excerpt may explain the holding better. It is said:

"No alien has the slightest right to naturalization unless all statutory requirements are complied with; and every certificate of citizenship must be treated as granted upon condition that the government may challenge it, as provided in § 15, and demand its cancellation unless issued in accordance with such requirements. If procured when prescribed qualifications have no existence in fact, it is illegally procured, a manifest mistake by the judge cannot supply these nor render their existence nonessential."

This case was followed and quoted by the case of Tutun v. United States[10] which held only that a proceeding where the petitioner's witnesses were examined in open court the court "exercises judicial judgment" and therefore an order denying admission to citizenship was appealable. The court say:

"The petitioner's claim is one arising under the Constitution and laws of the United States. The claim is presented to the court in such a form that the judicial power is capable of acting upon it. The proceeding is instituted and is conducted throughout according to the regular course of judicial procedure. The United States is always a possible adverse party. By section 11 of the Naturalization Act * * * the full rights of a litigant are expressly reserved to it. See In re Mudarri, C.C., 176 F. 465. Its contentions are submitted to the court for adjudication. See Smith v. Adams, 130 U.S. 167, 173, 174, 9 S.Ct. 566, 32 L.Ed. 895. Section 9 * * * provides that every final hearing must be held in open court, that upon such hearing the applicant and witnesses shall be examined under oath before the court and in its presence, and that every final order must be made under the hand of the court and shall be entered in full upon the record. The judgment entered, like other judgments of a court of record, is accepted as complete evidence of its own validity unless set aside."

The Tutun case was decided April 12, 1926.

Within two months after the promulgation of the decision in the Tutun case, on June 8, 1926, 44 Stat. 709, Congress amended the Act of 1906 by adding thereto the following provisions:

"(a) The judge of any United States dis-

[8] 225 U.S. 227, 238, 241, 242, 32 S.Ct. 613, 615, 56 L.Ed. 1066.

[9] 243 U.S. 472, 37 S.Ct. 422, 425, 61 L.Ed. 853, decided April 9, 1917.

[10] 270 U.S. 568, 577, 46 S.Ct. 425, 427, 70 L.Ed. 738.

trict court, or the senior judge of such court if there are more judges than one, is hereby authorized, in his discretion, to designate one or more examiners or officers of the Bureau of Naturalization (including the Naturalization Service) serving as such examiner or officer within the territorial jurisdiction of such court, to conduct preliminary hearings upon petitions for naturalization to such court, and to make findings and recommendations thereon. For such purposes any such designated examiner or officer is hereby authorized to take testimony concerning any matter touching or in any way affecting the admissibility of any petitioner for naturalization, to subpoena witnesses, and to administer oaths, including the oath of the petitioner to his petition and the oath of his witnesses.

"(b) The findings of any such designated examiner or officer upon any such preliminary hearing shall be submitted to the court at the final hearing upon the petition required by section 9, with *recommendation* that the petition be granted or denied or continued, with the reasons therefor. Such findings and recommendations shall be accompanied by duplicate lists containing the names of the petitioners, classified according to the character of the recommendations, and signed by the designated examiner or officer. The judge to whom such findings and recommendations are submitted shall by written order *approve such recommendations* with such exceptions as he may deem proper, by subscribing his name to each such list when corrected to conform to his conclusions upon such recommendations. One of such lists shall thereafter be filed permanently of record in such court and the duplicate list shall be sent by the clerk of such court to the Commissioner of Naturalization.

"(c) The provisions of section 9 requiring the examination of the petitioner and witnesses under oath before the court and in the presence of the court shall not apply in any case where a designated examiner or officer has conducted the preliminary hearing authorized by this subdivision; ex-cept that the court may, in its discretion, and shall, upon demand of the petitioner, require the examination of the petitioner and the witnesses under oath before the court and in the presence of the court."[11]

Following this manifestation of legislative intent, Congress in 1929, 45 Stat. 1513, further made express the implications of the previous amendment, by omitting from Section 4 thereof, which laid down the qualifications required of an alien seeking citizenship, the words "It shall be made to appear to the satisfaction of the court admitting any alien to citizenship"[12] that the alien possess such qualifications and substituting therefor, a provision as follows:

Prerequisites to Admission to Citizenship; Residence; Character; Attachment to Principles of Constitution; Proof. No alien shall be admitted to citizenship unless (1) immediately preceding the date of his petition the alien has resided continuously within the United States for at least five years and within the county where the petitioner resided at the time of filing his petition for at least six months, (2) he has resided continuously within the United States from the date of his petition up to the time of his admission to citizenship, and (3) during all the periods referred to in this section he has behaved as a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.[13]

Emphasizing the administrative character of the proceeding at the same time, Congress authorized the Commissioner of Immigration and Naturalization with the consent of the Secretary of Labor, to make such rules and regulations and such changes in the prescribed forms "as may be necessary to carry into effect the provisions of the naturalization laws." [14] All the forms and procedure in naturalization have since been furnished by administrative authority even to the order of court approving the recommendations.[15]

■ At the time these acts were passed amending the basic statute, it had been

---

[11] Emphasis supplied.

[12] It will be noticed that these words were still in the statute in 1927 when Schneiderman was admitted. The references to these words in the opinions is entirely accurate. United States v. Schneiderman, 320 U.S. 118, 162, 171, 176, 179, 63 S.Ct. 1333, 1335, 87 L.Ed. 1796.

[13] Act of March 2, 1929, c. 536, § 6 (b), 45 Stat. 1513.

[14] Act of March 2, 1929, c. 536, § 8, 45 Stat. 1513.

[15] Curiously enough the form of certificate was never amended and carried the words "the court having found that the petitioner had resided continuously within the United States for at least five

250

made abundantly plain that the courts did not have adequate facilities to determine the facts as to each of the vast number of aliens who were seeking admission to citizenship.[16] The plain intent of Congress by these amendments was to set up an administrative body which would conduct non-judicial hearings.[17] The administrative officer was to make findings satisfactory to him, but the reports and debates in Congress show that these were not to be judicial findings.[18] Specifically, the judge was not to approve them, but only by written order to approve "such recommendations."

When the words "it shall be made to appear to the satisfaction of the court" were taken from the statute and the words "no alien shall be admitted to citizenship" were substituted, the possession of such qualities enumerated was made a condition precedent to a valid final order or certificate of admission. Thus, Congress exercised in reference to naturalization, the power which

Justice Brandeis said[19] was inherent in that body. "It may provide a legal remedy, but make resort to the courts available only after all administrative remedies have been exhausted. * * * It may give to the individual the option of either an administrative or a legal remedy."

Congress, two months after this opinion was announced, provided an administrative remedy to the alien desiring admission and it was only when he expressed a desire for the alternative judicial remedy, or when the administrative remedy ended in a refusal of admission, that the judicial remedy was made available to him.

The administrative officers and the courts who have designated examiners, have construed these amendments in accordance with what seems to have been the purpose of Congress as above outlined. The examiners pursued their own course in accordance with rules and regulations laid down by the Commissioner of Immigration, De-

years and in this State for one year immediately preceding the date of hearing of his (her) petition, and that said petitioner intends to reside permanently in the United States, had in all respects complied with the law in relation thereto, and that—he was entitled to be so admitted, it was thereupon ordered by the said court that—he be admitted as a citizen of the United States of America." This form was incorporated in § 27 of the original act of June 29, 1906, 34 Stat. 603. It will be noted that the form itself did not indicate that the court had made any finding in regard to the attachment of the alien to the principles of the Constitution.

[16] House Report 1328, 69th Congress, May 27, 1926: "For years the Secretary of Labor and the Committee of Naturalization have recommended legislation of this character primarily to relieve the courts in large cities from the disorderly congestion of the unnecessary number of witnesses with the applicants at naturalization hearings."

[17] House Report 1328, 69th Congress, May 27, 1926: "The naturalization examiners have for years conducted administrative examinations of the applicants and their witnesses and reported the results to the courts."

[18] Congressional Record, June 2, 1926: "The Speaker: Is there objection to the present consideration of the bill?

"Mr. McKeown: Reserving the right to object, I suggest to the gentlemen it is all right without having a finding of fact. When they make a finding of fact that empowers this officer as a quasi-judicial

officer, and it becomes a judicial matter. If you strike out the word 'findings' * * *

"Mr. Johnson of Washington: The word 'findings' has been changed to 'recommendations' as to each case going up to the Federal judge.

"Mr. McKeown: If you will strike out the word 'findings' and let the naturalization officer make investigation and submit it to the court to make its own findings, I would have no objection.

"Mr. Johnson of Washington: That has been done, I think. The naturalization officer recommends, but that is not binding. The situation has been intolerable for some time. At present it is this way. The examiners go in the courts with sets of books and two witnesses for each candidate, a large part of which is unnecessary. This bill arranges the process so that the chief examiner may arrange three lists for the court—accepted, postponed and rejected—and with these are the recommendations. In fact, they are the recommendations. The court then acts, and the candidate in each case takes oath before the court.

"Mr. McKeown: If the word 'findings' is stricken out, I have no objection. I objected to the word 'finding' because of the difficulty of setting aside a finding, as the gentleman knows.

"Mr. Johnson: Mr. Speaker, I think the bill is understood."

[19] Tutun v. United States, 270 U.S. 568, 569, 576, 577, 46 S.Ct. 425, 426, 70 L.Ed. 738.

partment of Labor.[20] The court exercised no supervision over such proceedings. Only in exceptional cases were judicial hearings held in court. Normally the judge did not see any witnesses; he did not hear any evidence; nor did he even have the petition for naturalization in court. No actual findings or conclusions or reasons for the recommendations were ever stated to the court by the respective examiners. The final proceeding was reduced to the presentation of the recommendation for admission of classes of applicants—hundreds of them at times—and the administration of the oath.[21] No actual hearings were held in court unless demanded by a petitioner after an adverse finding by the administrative officer.

Obviously, no judge availed himself of the privilege given to him by the statute of requiring the list to be conformed in accordance with "his conclusions upon such recommendations." The administrative officers had been designated by the political departments of the government and were conforming to a policy laid down by the heads of these departments. The judge had no opportunity to know the facts regarding the hundreds of recommendations which were placed before him.[22] He was bound to assume that these competent officers of the government had made such investigation as was required by the governmental policy then being pursued. Recurrently in our history, there have been various pressures brought to require officers to be extremely liberal in admissions.

The construction placed upon the act by the administrative officers who were carrying it out was that behavior, indicating attachment to the principles of the Constitution for five years prior to admission, was a statutory prerequisite to validity of the certificate. This is the practical construction of the statute by experts required

to enforce it when its terms were new. This construction has been unchallenged for many years and it is thus strong evidence of the correctness thereof,[23] and obviously should be followed unless manifestly wrong.[24] The construction of the courts which were enforcing the act is likewise unchallenged. No District Judge who has proceeded under the system of designated examiners has looked into the facts, or read the petition or the examination based thereon, or has assumed to make any findings regarding attachment of an alien to the principles of the Constitution of the United States.

Since the administrative officials carrying out the provisions of the act and the courts entering orders which were the basis for issuance of certificates of admission have construed the act to require no finding by the court and no findings are made, it should be determined what consequences follow. First, if a finding as to attachment and behavior is a prerequisite to the entry of a valid order, all such certificates must be cancelled for illegality. Second, if the finding of attachment is not a prerequisite to the entry of the "final order", then such an order is not conclusive as to the facts either of behavior or attachment. Third, if a finding as to attachment and behavior is not a prerequisite to the entry of the "final order", no appeal can be taken from an order which does not contain such a finding and the United States has no remedy to void a certificate, except by a cancellation proceeding, where the alien did not actually possess the prerequisite characteristics in fact. Each of these postulates will now be considered.

If such a finding were a condition precedent to admission, the "final order" and certificate of each of the applicants passed through such courts was illegally procured. It should be then so adjudged whether it

---

[20] The judges no longer designate the examiners who are now completely under administrative control. Act of October 14, 1940, c. 876, Title I, Subchap. III, § 333, 54 Stat. 1156, 8 U.S.C.A. § 733.

[21] If the court must make findings judicially in naturalization, every conscientious judge must abandon the examiner system and hear each applicant so that the court will have a basis upon which to make findings.

[22] If the language of the present act to the effect that "the findings of any such designated examiner upon any such

preliminary hearing shall be submitted to the court", means that the court makes or adopts the finding judicially, the whole purpose of the Act of 1926 and the amendment of 1929 establishing the examiner system will be completely frustrated. The conscientious judge must give consideration to the facts of each individual case.

[23] Wright v. Central of Georgia R. Co., 236 U.S. 674, 35 S.Ct. 471, 59 L.Ed. 781.

[24] Surgett v. Lapice, 8 How. 48, 49, 12 L.Ed. 982; Schell v. Fauche, 138 U.S. 562, 11 S.Ct. 376, 38 L.Ed. 1040.

was the fault of the alien or the fault of the judge.[25] But those courts which adopted the examiner system, construed the Act of 1926 to change the law and require no finding. By the amendment of 1929, the purpose of Congress became abundantly clear and the lower courts and the administrative officers have continuously so construed these provisions. The fact and not a judicial finding as to the fact, was an essential.

However, the very factor which prevents cancellation for illegality, on the ground that the court made no finding, precludes the entry of the "final order" from having the force of res judicata as to the factual conditions precedent to admission. The mere calling of the order of the court admitting an alien to citizenship a "judgment", does not, according to the principles of res judicata, establish the facts.[26] A judgment is only conclusive as to those issues which were actually and as a matter of fact determined by the court. The evidence, together with the findings and conclusions, must be examined to discover what facts were really determined and what issues were really established by the judgment entered thereon. Thus it is that the doctrine of the Johannessen case regarding ex parte proceedings in court comes into full play in the cases where the designated examiners are used.[27]

While it is true that either the petitioner or the judge of his own motion, or the designated examiner could in any one of these cases have had the matter heard in open court and the United States Attorney could then have appeared and examined the witnesses, there was no judicial finding on the facts unless these proceedings were taken. The judge does not actually pass on the facts nor does he have any opportunity to do so. In the Mercoid Corp. v. Mid-Continent Inv. Co., 320 U.S. 661, 64 S.Ct. 268, 274, it is said:

"The fact that it might have been asserted as a counterclaim in the prior suit by reason of Rule 13(b) of the Rules of Civil Procedure * * * does not mean that the failure to do so renders the prior judgment res judicata as respects it. Virginia-Carolina Chemical Co. v. Kirven, 215 U.S. 252, 30 S.Ct. 78, 54 L.Ed. 179; Larsen v. Northland Transp. Co., 292 U.S. 20, 54 S.Ct. 584, 78 L.Ed. 1096. And see Scott, Collateral Estoppel by Judgment, 56 Harv. L.Rev. 1, 26-28; Restatement of the Law of Judgments, § 58. The case is then governed by the principle that where the second cause of action between the parties is upon a different claim the prior judgment is res judicata not as to issues which might have been tendered but 'only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered'. Cromwell v. County of Sac, 94 U.S. 351, 353, 24 L.Ed. 195. And see Russell v. Place, 94 U.S. 606, 24 L.Ed. 214."

Finally, the doctrine of the Tutun case,[28] with regard to appeals, cannot be valid when applied to proceedings in which a final order is entered approving the recommendations of a designated examiner. The alien who has been denied admission cannot appeal, nor can the United States appeal from the admission of an alien. The reason is the same in both instances. Neither has pursued, to the required extent, the remedies given and has brought a controversy before the court so that a judicial finding may be made. There is no method of appeal from the administrative finding because there has been no adoption thereof by the court and there is no record upon which appeal may be founded.

It must be remembered that even in the case where there was, of necessity, a judicial finding and an appeal, the Supreme Court, through Mr. Justice Brandeis, held that, quoting the Johannessen case, if the qualifications did not in fact exist, the certificate could be set aside. It was said:

"If a certificate is procured when the prescribed qualifications have no existence

---

[25] United States v. Ginsberg, 243 U.S. 472, 37 S.Ct. 422, 61 L.Ed. 853.

[26] "The judgment attacked did not make the matter res judicata, as against the statutory provision for review." Maney v. United States, 278 U.S. 17, 23, 49 S.Ct. 15, 16, 73 L.Ed. 156.

[27] An excellent opinion by Judge Chesnut holds that the doctrine of res judicata does not apply as to the prerequisite for naturalization. There the fact that the proceedings are actually ex parte is suggested. United States v. Parisi, D.C., 24 F.Supp. 414, 418. It is true the administrative officers do play a large part in obtaining certificates. However, their role is no more important than that of the Patent Office in making that type of grant. The proceedings in court are not adversary, but ex parte so far as the judge is concerned.

[28] Tutun v. United States, 270 U.S. 568, 46 S.Ct. 425, 70 L.Ed. 738.

in fact, it may be canceled by suit. 'It is in this respect,' as stated in Johannessen v. United States, 225 U.S. 227, 238, 32 S.Ct. 613, 615, 56 L.Ed. 1066, 'closely analogous to a public grant of land (Rev.Stat. § 2289 [etc.]) or of the exclusive right to make, use and vend a new and useful invention (Rev.Stat. § 4883 [etc.]).' " [29]

With this history of the enactments, the language of Chief Justice Stone as to this type of case, comes strongly into the foreground.

"This is persuasive that the interpretation of § 15 now proposed defies the purpose and will of Congress. It is inconceivable that Congress should have intended that a naturalized citizen's attachment to the principles of the Constitution—the most fundamental requirement for citizenship—should be the one issue which, in the absence of fraud, the Government is foreclosed from examining. To limit the Government to proof of fraud in such cases is to read 'illegality' out of the statute in every instance where an alien demonstrably not attached to the principles of the Constitution has procured a certificate of citizenship. Even if we were to recast an Act of Congress in accordance with our own notions of policy, it would be difficult to discover any considerations warranting the adoption of a device whose only effect would be to make certain that persons never entitled to the benefits of citizenship could secure and retain them. That could not have been the object of Congress in enacting § 15." [30]

If Congress did not intend there should be cancellation for illegality where there was a judicial finding, it was made abundantly plain after 1929 that such was the legislative intention.

Since each of the three postulates has been found valid, the analogy above suggested is almost conclusive in proceedings which are strictly ex parte and of an administrative nature and in which the government has no remedy by appeal, but must rely entirely upon a cancellation proceed-

ing to prevent privileges being exercised under certificates illegally obtained. [31] In such a cancellation proceeding against a certificate of naturalization so obtained, judicial enquiry may be made as to the attachment of the alien to the principles of the Constitution and his behavior prior to the granting of citizenship.

It is thus clear that the expressions in the opinions of the Schneiderman case cannot have application to any situation where no finding as to attachment or behavior of the alien was made. Indeed, the exact distinction has already been made by the Supreme Court. In 1934 there was admitted in the Southern District of California, one Herman Max Schwinn, upon a recommendation of a designated examiner, where the witnesses did not appear in open court. Upon denaturalization proceedings, a very able judge of that court, Honorable Ralph E. Jenney, found that the witnesses had testified before the examiner that they had known petitioner longer than the facts, when examined judicially, proved was the case. [32] Obviously, if the witnesses had been before the court the finding on this testimony would have been part of the judicial function. Based upon appropriate findings in the subsequent proceeding, Judge Jenney cancelled the certificate upon the grounds of illegality and fraud. The Circuit Court of Appeals affirmed, placing the affirmance on the ground of fraud. [33] But the Supreme Court affirmed by memorandum opinion and placed that action squarely upon the ground of illegality. [34] This is a definite holding that the primary action of the court in admitting Schwinn did not include a finding upon the subject of residence which was binding upon it or which prevented an examination thereof by the court. There is then, no basis upon which the opinions in the Schwinn case and the Schneiderman case can stand except this very distinction regarding the course of procedure respectively, in the court in relation to the issuance of the certificate in the first instance. [35]

---

[29] Tutun v. United States, 270 U.S. 568, 578, 46 S.Ct. 425, 427, 70 L.Ed. 738.

[30] Schneiderman v. United States, 320 U.S. 118, 177, 178, 63 S.Ct. 1333, 1361, 87 L.Ed. 1796.

[31] Cancellation for illegality because of lack of good moral character in critical period. United States v. Marafioti, D. C., 43 F.Supp. 45, 47. See United

States v. Chiaravalle, D.C., 45 F.Supp. 509.

[32] No published opinion.

[33] Schwinn v. United States, 9 Cir., 112 F.2d 74, 75.

[34] Schwinn v. United States, 311 U. S. 616, 61 S.Ct. 70, 85 L.Ed. 390.

[35] Since the record in the Schneiderman case did not show what actually

In the case at bar, the enquiry must then be, what procedure was followed in issuing a certificate of naturalization to Scheurer. In the District of Oregon, the records of which the court takes judicial knowledge, an examiner was designated by the senior judge thereof, in December 1926. Since that time, fifteen thousand two hundred forty-four applicants have been admitted under this administrative procedure.[36] Five different judges have sat in the court and have signed the orders approving the recommendations of the examiner. No one of them has construed this act as requiring the judge or court to examine the evidence and pass judicial judgment upon the qualifications of these thousands of applicants who have been recommended and to whom certificates have been issued.[37] No one of them has made any finding favorable or adverse, as to the qualifications of any alien to be admitted to citizenship unless at the request of the alien or the designated examiner, the matter was set for trial and was tried. As the evidence shows, this procedure was followed in the Scheurer case. There was no finding by the court that Scheurer had behaved as a person "attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States." Nor was there any judicial finding that Scheurer was so attached or so disposed.[38] The court knows as facts, the matters stated here and in the beginning of this opinion, as to the course of events which culminated in the issuance of a certificate to Scheurer. It is here established, by judicial knowledge and by evidence, that the examiners did not make any examination into the attachment of Scheurer to the Constitution and therefore made no finding on that subject. Also, it is so established that the court made no such finding. From the mere statement that the examiner made no finding on this subject, it follows the court did not approve or adopt any such finding made by them.[39]

The court, in accordance with the previous discussion, holds that the failure of the court to make any findings of fact does not vitiate the certificate. The procedure followed here was sanctioned by administrative practice and judicial custom since the designation of an examiner in 1926 by this very court. But since the question of the possession, by Scheurer, of the statutory prerequisites to admission has never before been examined, the enquiry is

---

happened in the District Court, the distinction between administrative and judicial hearings was unnoticed. However, the opinion of Chief Justice Stone contains the following language: "And in Schwinn v. United States, supra, it appeared, from extrinsic evidence first offered in a § 15 proceeding, that the witnesses at the naturalization hearing had been mistaken as to the length of time they had known the applicant, and that for a part of the five-year period no witness had been produced with actual knowledge of the applicant's residence or qualifications. We held, without dissent, 311 U.S. 616, 61 S.Ct. 70, 85 L. Ed. 390, 'that the certificate of citizenship was illegally procured', and for that reason we affirmed a judgment cancelling it. If we are to give effect to the language and purpose of Congress, it would seem that we must reach the same result in the case of the naturalization court's mistaken or unwarranted finding of attachment to the principles of the Constitution, even though the conduct of the applicant and his witnesses at the naturalization hearing fell short of perjury."

[36] As of December 21, 1943.

[37] If the opinions in the Schneiderman case are applicable, each of these judges has failed in his duty by neglecting to have the evidence placed before him so that a judicial finding could be made.

[38] In a similar case, Judge Yankwich remarks that the fact that the alien had indicated clearly to the examiner that he would not take up arms against Germany, on the preliminary hearing, was not called to the attention of the judge who approved the recommendation for admission. The general procedure whereby no judge sees the petitions or hears of the incidents of the examination, was not commented upon. It is safe to say no judge would have approved the recommendation of this fact had it been shown to him. But the judge is supposed to have made a judicial finding which the United States cannot question even if this state of facts were shown to exist before admission. The ground of cancellation chosen by Judge Yankwich was fraud and not illegality. United States v. Bergmann, D.C., 47 F.Supp. 765.

[39] The finding of administrative officers, even where a question of citizenship is involved, does not lay a foundation for the doctrine of res judicata. Flynn ex rel. Ham Loy Wong v. Ward, 1 Cir., 95 F.2d 742; Wong Chow Gin v. Cahill, 9 Cir., 79 F.2d 854.

now pertinent and is unembarrassed by previous judicial finding.

█ Caution must be observed in setting aside this "judgment" relating to Scheurer because it is a judicial act even if it be not founded on such findings of fact. No doubt an be entertained that the proof must be "full clear and convincing." This is true in cases of other grants of the United States and is required by the Johannessen case.

█ But the very act which provides for cancellation indicates that Congress intended subsequent conduct to give the clue as to intention at the time of admission. In Section 15 itself, it is provided that if the alien who has secured citizenship shall, within five years after admission take up residence in a foreign country "it shall be considered prima facie evidence of a lack of intention" upon his part to become a permanent citizen of the United States "at the time of filing his application" therefor. This single circumstance in the absence of countervailing evidence is sufficient for cancellation by the exact language of the statute itself. Although other subsequent acts do not avail to cancel in and of themselves, by analogy they may be conclusive of the absence of that attachment to the principles of the Constitution required of the alien at the time of his admission.

█ An effort must now be made to determine whether a proper order for admission could have been made by this court if it had had placed before it then, evidence of the state of mind of Scheurer as it is now reflected from the record of this case. The examination of these facts regarding the attachment of Scheurer to the principles of the Constitution should not involve a weighing of the evidence against him because of changes in "the potential temper of majority thought and the stresses of the times." Particularly, guard must be kept against unconscionable prejudice because of the state of war existing between this country and Germany.

Laying aside such influences, it is presently incontrovertible that the doctrines of Aryan and Teutonic world domination intermeshed with the theory of the supremacy of the allegiance to blood over oaths of allegiance to other countries, were utterly incompatible with the principles of the Federal Constitution.

The quality of loyalty is a mental or emotional state. The maintenance of allegiance has the same characteristics. The attitude of devotion to the principles of the Constitution falls within the same category. Congress provided in the procedure for admission to citizenship, not the repetition of the mere form of words, but an essential change of mental attitude extending over five years prior to the filing of the petition for admission. The mind which could harbor the principles above outlined, which were so subversive of freedom of thought, could not at the same time be loyal to the fundamental principles of this government.

The field of naturalization has, historically, been fertile with illegal procedures.[40] Many aliens admitted to citizenship must have cynically smiled at the expounding of virtues of American citizenship in the statutory eulogy considering the base means by which they actually had obtained these supposedly priceless privileges. The government of the United States should not be exposed without remedy to the machinations and disloyalties of persons illegally admitted to citizenship. The record in this case shows that as a matter of policy a premium was placed upon obtaining citizenship by those adhering to the Nazi doctrines. Membership in the German-American Bund was conditioned on American citizenship and men known to be loyal to the principles of the national socialist party of Germany, were encouraged to become naturalized in the United States for the purpose of building up a nucleus of disloyalty. The certificate of admission was used as a mantelet to protect such persons devoted to alien principles while they attempted to undermine the foundations of this government. If no remedy exists for such illegal acquisition of citizenship, a weak spot has been discovered in our system. A choice must be made between the abstraction of political privileges thus illegally obtained upon false representation by disloyal aliens and the ultimate security of the government of the United States.

█ No magic circle of immunity should be drawn about an alien in outlook and deed simply because he has made false representations to administrative officers and concealed his inherent disloyalty. The methods of denaturalization should, as a matter of public policy, be made more facile where there is clear and convincing evi-

---

40 The Act of 1906 was passed including § 15, in order to cure illegal procedures in admission and provide cancellation if an error was made.

dence of illegality of admission.[41] Such a course prevents classification of citizens into those who may be arrested, detained and exiled and those for whom the fundamental guarantees of the Bill of Rights still exist. Either the executive or the legislative have plenary power to control aliens, native of a country with whom the United States is at war, and may dispose of them restrained only by the dictates of humanity. The military has already seized and exiled Scheurer from the territory in which he had made his home in Oregon. If the sentence of denaturalization is here pronounced, this action is justified. It will then be established that Scheurer is not a citizen, but an alien who, under the cloak of illegality, obtained the privileges of citizenship. If it be not pronounced, then such arrest, detention and removal can be justified, if at all, only on the ground of military necessity. Appropriate procedure has been provided by Congress whereby such a determination can be made in this proceeding.

■ The courts of the United States, with remarkable unanimity, have held that the subsequent actions and declarations may be evidentiary of the state of mind prior to admission.[42] It is impossible to believe that Scheurer who succeeded Vennekohl as "leader" at the time Vennekohl fled to Germany and was rewarded, did not at the time he assumed a post, at that time dangerous, subscribe to the pan-Teutonic doctrine. The court specifically finds from the evidence, that at the time he became "leader", Scheurer was not loyal to the principles of the Constitution of the United States which he had sworn "to uphold and defend against all enemies foreign and domestic."

■ The problem of relation back of such sentiments is of course a difficult one.[43] But membership in the officer's corps of the German army, promotion for "bravery" against allied troops, professed hatred of unjust treaty provisions of Versailles, the adoption of the principles of the Nazi in relation to the Jews and the reverence of Hitler, establish this thesis to the satisfaction of the court. The entertainment of such sentiments coupled with Scheurer's relation to the Stahlheim in Germany, the German Veteran's Organization and the Friends of New Germany, indicates that the same sentiments which actuated him in assuming leadership in a subversive organization actuated him before and at the time of his admission to citizenship. It is established that he said he would not fight against Germans on German soil. This alone shows that he had never accepted the full obligation of citizenship and if this fact had been known to the examiners, no certificate could have been issued in the first instance.[44]

We are not dealing here with a person who came to this country as an infant and who was reared among free institutions, but with a person who was indoctrinated with the philosophy of the German school and the German army. In cancellation of this certificate of naturalization, the consummation of illegality is prevented.

■ The court, therefore, upon the clear and convincing proof, finds that Scheurer was not in fact, and did not behave as, a person attached to the principles of the Constitution of the United States for a period of five years prior to the taking of the oath of allegiance. Upon this basis, decree of cancellation will enter.

The complaint in this case also contains allegations relating to fraud upon the part of the petitioner in taking various false oaths before and at the time of admission.

[41] See Forrest R. Black "Disloyalty and Denaturalization" Kentucky Law Journal, January 1941, Vol. XXIX No. 2.

[42] Luria v. United States, 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101; Baumgartner v. United States, 8 Cir., 138 F.2d 29; United States v. Krause, 7 Cir., 136 F. 2d 935, 938, 939; United States v. Haas, D.C., 51 F.Supp. 910; United States v. Schuchhardt, D.C., 49 F.Supp. 567; United States v. Kuhn, D.C., 49 F.Supp. 407; United States v. Fischer, D.C., 48 F.Supp. 7; United States v. Bergmann, D.C., 47 F.Supp. 765; United States v. Wolter, D.C., 53 F.Supp. 417, 424; United States v. Mickley, D.C., 44 F.Supp. 735.

[43] The court does not palliate or defend warping of facts in order to reach a result under the statute, no matter what the motive may be. This seems to have been done in United States v. Wursterbarth, D.C., 249 F. 908 and United States v. Darmer, D.C., 249 F. 989. But see Rowan v. United States, 9 Cir., 18 F. 2d 246, 248. These cases do not make the distinction here suggested.

[44] United States v. Macintosh, 283 U. S. 605, 51 S.Ct. 570, 75 L.Ed. 1302; United States v. Bland, 283 U.S. 636, 51 S.Ct. 569, 75 L.Ed. 1319; United States v. Schwimmer, 279 U.S. 644, 49 S.Ct. 448, 73 L.Ed. 889.

The court finds each of these allegations true.

Findings and judgment for plaintiff on all the allegations of the complaint may be prepared.