## STASIUKEVICH v. NICOLLS.

### No. 4279.

Circuit Court of Appeals, First Circuit.

May 27, 1948.

Carol King, of New York City (Frederick Cohen, of Boston, Mass., on the brief), for appellant.

Arthur J. B. Cartier, Asst. U. S. Atty., of Boston, Mass. (William T. McCarthy, U. S. Atty., of Boston, Mass., on the brief), for appellee.

Before MAGRUDER, MAHONEY and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

This is an appeal from an order denying a petition for naturalization.

The petition, which was filed March 3, 1944, met the formal requirements of the statute. It was accompanied by an affidavit of two citizens attesting to their personal knowledge that the petitioner has continuously resided in the United States since 1932; that he "is now and during all such period has been a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States, and in my opinion the petitioner is in every way qualified to be admitted a citizen of the United States." Petitioner executed the statutory oath of allegiance. In accordance with § 333 of the Nationality Act of 1940, 54 Stat. 1156, 8 U.S.C.A. § 733, the Immigration and Naturalization Service made its recommendation to the court, which was that the petition should be denied on the ground of "lack of attachment".

On January 20, 1947, the petition came on for hearing before the district court. Stasiukevich testified in support of his petition. He came to this country from Poland in 1906 and thereafter has continuously resided in Maynard, Massachusetts. In 1910 he married an alien who has since become nat-

476

uralized. As to his occupation, he testified, "I examine cloth, and dry finish." Since 1926, or 1928, he has been a member of the International Workers Order, which describes itself as a "people's fraternal benefit society". A booklet containing its declaration of principles, its constitution and by-laws, which is before us as an exhibit, does not appear to indicate anything of a "subversive" character in its professed aims and purposes. Stasiukevich is an officer of the Maynard lodge of the International Workers Order. The lodge meets in a building owned by the Russian Educational Society, subject to a mortgage held by Stasiukevich and others. "Some people" call the building "Red Hall". At this hall Stasiukevich has done some teaching of the Russian language. He made a visit to Leningrad and Moscow in 1933, and found life there "not satisfactory" at that time. He denied being a member of the Communist Party; said that he had never advocated sabotage or the forceful overthrow of government, and stated that if he became a citizen he would "support the principles of the Constitution of the United States".

The two citizens who executed the affidavit aforesaid, attached to the petition, testified in the sense of the affidavit.

One Lewis Marks, "assistant manager of the American Electric Supply, wholesale electric house in Boston", holding the office of treasurer of the International Workers Order in the State of Massachusetts, testified as to the operation of the Order as a fraternal benefit society. He said members were accepted "regardless of their race, creed, color or political affiliations"; that some of the members of the Order might be Communists, since their political affiliation is not questioned; but that the Order "definitely is not Communistic", and operates on democratic principles.

The only witness offered by the Immigration Service in opposition to the petition was Joseph S. Apelman, an immigration inspector. He testified that he had made an investigation of Stasiukevich; that he had visited Maynard and had talked with perhaps fifteen or twenty members of the community where Stasiukevich resides. In answer to a question on direct examination as to what was Stasiukevich's "reputation in the community", the witness answered: "His reputation in the community is of being a Communist." [1]

Apelman further testified that he had had occasion to investigate the character of the International Workers Order; that he had "studied the report of the Special Commission to investigate the activities within the Commonwealth of the Communists, Fascists, Nazis, and other subversive organizations, so-called; also the report of the Special Committee on un-American activities, House of Representatives, 78th Congress". Counsel for petitioner interposed "objection to this report, or series of reports, through the witness." Upon being assured that the government was going to offer the reports in evidence, the court allowed the examination to proceed. In answer to a question as to what was the "general trend" of the report of the Legislative Committee, Apelman read, somewhat inaccurately, a couple of sentences from the report, indicating that the aims and objectives of the International Workers Order are in support of the entire program of the Communist Party. Upon being asked to summarize the report of the Congressional Committee, Apelman quoted one brief excerpt from that report, as follows: "The International Workers Order is a mere adjunct of the Communist Party." Subsequently, the two reports referred to were introduced as exhibits.

At the close of the hearing, the district court stated: "The burden is on the plaintiff to show that he is attached to the principles. I will rule that the man has not sustained the burden of proving his attachment. Therefore, I deny his application." The court made no further findings. The order now appealed from, entered January 20, 1947, denied Stasiukevich's petition for naturalization.

Since the decision in Tutun v. United States, 1926, 270 U.S. 568, 46 S.Ct.

---

[1] The question was not objected to at the time, but in a motion to reopen the case, submitted on April 7, 1947, and denied on the same day, counsel for petitioner asked that the testimony be stricken.

425, 70 L.Ed. 738, it has been settled that a naturalization proceeding is a "case" or "controversy" within the meaning of Article III, § 2, of the Constitution and of § 128 of the Judicial Code, 28 U.S.C.A. § 225, and that an order denying a petition for naturalization is a "final decision" within the meaning of § 128 of the Judicial Code and as such is appealable to the circuit court of appeals. Congress having, in the Nationality Act of 1940, afforded to aliens an opportunity to be naturalized, "there is a statutory right in the alien to submit his petition and evidence to a court, to have that tribunal pass upon them, and, if the requisite facts are established, to receive the certificate. * * * In passing upon the application the court exercises judicial judgment. It does not confer or withhold a favor." (270 U.S. at page 578, 46 S.Ct. at page 427, 70 L.Ed. 738.)[2]

As one of the statutory conditions upon eligibility for naturalization, which a petitioner has the burden of establishing, § 307(a) of the Nationality Act, 54 Stat. 1142, 8 U.S.C.A. § 707(a), provides that naturalization may not be granted unless the petitioner "during all the periods referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States."

■ It is not easy to state what are the "principles of the Constitution" within the meaning of the Nationality Act, and the courts have generally shied off from concrete definition. In Schneiderman v. United States, 1943, 320 U.S. 118 at pages 137-140, 63 S.Ct. 1333 at pages 1342-1344, 87 L.Ed. 1798, a denaturalization case, the point was raised, and discussed somewhat, but the court found that in the case before it "precise definition" was unnecessary (if indeed such was possible), because, even accepting the test advanced by the Solicitor General, the government had not sustained

the heavy burden of proof resting upon it in a proceeding for cancellation of a grant of naturalization. The court did indicate that one might be attached to the principles of the Constitution, within the statutory meaning, notwithstanding his belief that many changes should be made in it. Further, it noted as an "extreme position" (320 U.S. at page 140, 63 S.Ct. at page 1344, 87 L.Ed. 1798), without considering its validity, that since Article V of the Constitution contains no limitation on the subject matter of possible amendments, "a person can be attached to the Constitution no matter how extensive the changes are that he desires, so long as he seeks to achieve his ends within the framework of Article V." We are confident that "attached to the principles of the Constitution" means more than that. The phrase goes back to the naturalization act of January 29, 1795, 1 Stat. 414. It is hardly to be supposed that the members of Congress of that day, having so recently completed a successful revolution, conceived that the phrase "the principles of the Constitution" comprehended only one principle, namely, that changes in the basic law must be effectuated only by the procedure laid down in Article V. The statutory word is in the plural—"principles", not "principle". It is true enough, as Holmes, J., noted in his dissent in United States v. Schwimmer, 1929, 279 U.S. 644, 654, 49 S.Ct. 448, 451, 73 L.Ed. 889, that "if there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate." But it does not follow from this that the Congress would wish to admit to the privilege of citizenship aliens who were so far out of sympathy with our established form of government that they would like to see it supplanted by a totalitarian regime under which all individual liberties, including freedom of thought and freedom of speech, are swept into the discard.[3] A person is

---

[2] In the present case there is no need to consider possible qualifications upon the foregoing propositions, as discussed by Judge Fee in United States v. Scheurer, D.C.Or., 1944, 55 F.Supp. 243, reversed on other grounds in 9 Cir., 1945 150 F.2d 535.

[3] We are not prepared to assent to all that was said by Learned Hand, J., in United States v. Rossler, 2 Cir., 1944, 144 F.2d 463, 465, as to the meaning of attachment.

not attached to the kindred principles of free thought and free speech when he invokes the protection of those constitutional freedoms in aid of the struggle of his party to achieve power, being all the while intent upon suppressing the exercise of those very freedoms by others as soon as his party comes to power. In the absence of an authoritative ruling by the Supreme Court on the point, we accept the view expressed by Stone, C. J., dissenting, in the Schneiderman case, 320 U.S. at page 181, 63 S.Ct. at page 1363, 87 L.Ed. 1798, that there are principles of the Constitution, within the meaning of the Nationality Act, "and that among them are at least the principle of constitutional protection of civil rights and of life, liberty and property, the principle of representative government, and the principle that constitutional laws are not to be broken down by planned disobedience. I assume also that all the principles of the Constitution are hostile to dictatorship and minority rule; and that it is a principle of our Constitution that change in the organization of our government is to be effected by the orderly procedures ordained by the Constitution and not by force or fraud."

█ The right to appellate review of an order denying a petition for naturalization would be in large measure an empty one if the appellate court had necessarily to accept an ultimate finding or conclusion of the naturalization court that petitioner had failed to sustain the burden of establishing his attachment to the principles of the Constitution. Of course, the appellate court is not so bound. In Tutun v. United States, 1 Cir., 1926, 12 F.2d 763, the order of the district court denying the petition recited that petitioner "has failed to make it appear to the satisfaction of the court that for at least five years immediately preceding the filing of the petition he was attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the same". It appeared that in 1918 the petitioner had claimed alienage exemption from the draft

under the selective service act of the first World War. The basis of the court's ruling, as the record disclosed, was that no alien who had thus obtained exemption from military service in time of war could possibly be attached to the principles of the Constitution. This court reversed the order on the ground that, in denying the petition for the reason stated, the district court had in effect added another impediment to naturalization not to be found in the statute.

█ In the case at bar, the finding of the district court, above quoted, if it is properly to be described as a finding of fact, is a finding only of ultimate fact, inseparable from an unexpressed conclusion of law as to what constitutes attachment to the principles of the Constitution. On the record before us, this meager finding is insufficient to enable us to perform our appellate function intelligently. We are unable to tell "upon what underlying facts the court relied, and whether the proper statutory standards were observed." Schneiderman v. United States, 320 U.S. at pages 129, 130,[4] 63 S.Ct. at pages 1338, 1339, 87 L.Ed. 1798.

Did the court, for instance, have the view that Stasiukevich's lack of attachment to the principles of the Constitution was established by his membership in the International Workers Order? The court has made no finding that the International Workers Order is an organization which believes in, advises, advocates or teaches the overthrow by force or violence of the government of the United States; with such a finding, membership in the organization would be an independent ground of ineligibility for naturalization, under § 305 (b) of the Nationality Act, 54 Stat. 1141, 8 U.S.C.A. § 705(b). In the absence of such a finding, to deny naturalization merely because of Stasiukevich's membership in the International Workers Order would be erroneous as in effect adding a condition on eligibility to naturalization not found in the statute.

---

4 We do not mean to imply that detailed findings of subsidiary facts are necessary in all naturalization cases. There might be a case where, from the petitioner's own testimony, or from un- contradicted evidence as to his conduct and activities, the conclusion was clearly warranted that he was not attached to the principles of the Constitution. This is not such a case.

Or did the court find, without saying so, that Stasiukevich was a Communist, and infer from that that he was not attached to the principles of the Constitution? A finding that Stasiukevich was a Communist would have been clearly erroneous on this record. Membership in the Communist Party cannot be proved by Apelman's testimony concerning what he was told by fifteen or twenty persons in Maynard to the effect that Stasiukevich's reputation there was that of being a "Communist". This is hearsay of a particularly unreliable sort, in view of the loose and indiscriminate way in which the man in the street, and sometimes informed people who ought to know better, use the terms "communist" and "communistic".

It may be that, strictly speaking, Apelman ought not to have been allowed, over objection, to testify as to the conclusions drawn from his "investigation" of the character of the International Workers Order. Apelman admittedly knew nothing about this organization beyond what he had read in the two legislative reports referred to. His testimony on the subject consisted merely in reading brief extracts from these reports. But no substantial prejudice resulted from the reception of this line of testimony, since the reports themselves were later introduced as exhibits.

On the issue whether a petitioner for naturalization is attached to the principles of the Constitution, it may be relevant to inquire into the character, program, literature and activities of an organization with which petitioner has long been actively identified. In determining the weight to be attached to such evidence, it is important to bear in mind "that under our traditions beliefs are personal and not a matter of mere association, and that men in adhering to a political party or other organization notoriously do not subscribe unqualifiedly to all of its platforms or asserted principles." Schneiderman v. United States, supra, 320 U.S. at page 136, 63 S.Ct. at page 1342, 87 L.Ed. 1798. Nevertheless, if the organization has conspicuously supported a program and ideology hostile to the principles of the Constitution, it may be rational to infer that the petitioner shares the major beliefs of the organization to which he continues to adhere. The strength of this inference will naturally vary greatly with the facts of the particular case. In this connection there is a significant difference between a naturalization proceeding, where the burden of proof is upon the petitioner, and a denaturalization proceeding, where the burden of proof rests even more heavily upon the government. Schneiderman v. United States, supra; Baumgartner v. United States, 1944, 322 U.S. 665, 675, 64 S.Ct. 1240, 88 L.Ed. 1525.

The official report of a legislative or congressional committee is admissible in evidence in a judicial proceeding, as an exception to the hearsay rule, where the report, within the scope of the subject matter delegated to the committee for investigation, contains findings of fact on a matter which is at issue in the judicial proceeding. See Wigmore on Evidence, §§ 1662, 1670. Indeed, the court could properly take judicial notice of the report, without its formal introduction into evidence. But though the court may receive the report in evidence, or may take judicial notice of its existence and contents, this does not mean that the court must accept the findings in the report as indisputable truth; the findings are merely evidence of the facts asserted. See Unitd States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 445, 446; Morgan, The Law of Evidence, 1941-1945, 59 Harv.L.Rev. 481, 485-86 (1946). The credibility of such evidence will vary according to the thoroughness and impartiality with which the committee conducted its investigation, the fairness of its procedure, the fullness of opportunity it afforded accused individuals or organizations to develop their side of the story; and, of course, the other party may introduce evidence tending to prove the contrary of the facts asserted in the official report.

In the case at bar the court admitted in evidence the report of the "Special Commission to investigate the activities within this Commonwealth of Communistic, Fascist, Nazi and other subversive organizations, so called" (House No. 2100, 1938), pursuant to Chapter 32, Resolves of 1937, Mass.Acts and Resolves, 1937, p. 629. This

480

report contains a quite detailed recital of the antecedents, organization, history, literature and activities of the International Workers Order and makes the following ultimate finding with reference thereto:

"Without exception, the entire program of the Communist Party. and of its fringe organizations is followed by the I.W.O. With the Communist Party it shares: Hatred of religion, hatred of American patriotism, building defence of the Soviet Union, the war against capitalism, and the campaign to involve all American workers in a class struggle for power." (P. 381)

The report contains a similar recital of the structure, activities and program of the Communist Party, and finds that the objective of the Communist Party of Massachusetts, and of its affiliates "is to create a Soviet America, a dictatorship governed by a ruling caste constituting the Communist Party, as in Soviet Russia." [5]

The other report referred to, and admitted in evidence, is House Report No. 1311, 78th Congress, 2d Session, March 29, 1944 —Report of the Special Committee on Un-American Activities. This report dealt mainly with the C.I.O. Political Action Committee. In support of the thesis that the C.I.O. Political Action Committee had a Communist tinge, the report referred to one of the national leaders of this organization as being closely affiliated with the International Workers Order as writer and speaker, adding that the International Workers Order "is a mere adjunct of the Communist Party."

Though it was not error to receive these two reports in evidence in the case at bar, the credibility of the factual statements contained therein depends upon the factors above indicated. We cannot tell what credence, if any, the court attached to these reports, in reaching its ultimate conclusion as to Stasiukevich's lack of attachment to the principles of the Constitution. No findings were made as to the character and objectives either of the International Workers Order or of the Communist Party.

In view of the generally sketchy and unsatisfactory character of the present record, we think that the case should be retried, instead of being sent back merely for more detailed findings.

The order of the District Court entered January 20, 1947, denying the petition for naturalization, is vacated and the case is remanded to that court for further proceedings not inconsistent with this opinion.

---

[5] We gather from Schneiderman v. United States, supra, that a court may not judicially notice, as a matter of indisputable fact, that the Communist Party advocates the overthrow of the Government of the United States by force and violence and the substitution of a totalitarian regime under which the principles of the Constitution are to be conspicuous by their absence. This is a matter of evidence and proof. In the Schneiderman case, the court held that the United States had not established by clear, unequivocal, and convincing evidence, sufficient to set aside a naturalization decree, that the Communist Party, as of the crucial date there involved, advocated such a program (320 U.S. at pages 158, 160, 63 S.Ct. at pages 1352, 1353, 87 L.Ed. 1798). In 320 U.S. at page 153, 63 S.Ct. at page 1349, 87 L. Ed. 1798, the Court said: "We do not say that a reasonable man could not possibly have found, as the district court did, that the Communist Party in 1927 actively urged the overthrow of the Government by force and violence. But that is not the issue here."