Joseph F. Hawkins, J.
In this controversy arising out of the prodigious efforts by the petitioner, Matthias Reilly, to *1074 become a naturalized citizen of .the United States — so far frustrated — the introductory language by the late Mr. Justice Frahk Murphy, writing for the majority of the United States Supreme Court in Schneiderman v. United States (320 U. S. 118, 119-120), although relating to the rules of law applicable to a denaturalization proceeding, is well worth recalling: “ Our concern is with what Congress meant by certain statutes and whether the Government has proved its case under them.
“ While it is our high duty to carry out the will of Congress, in the performance of this duty we should have a jealous regard for the rights of petitioner. We should let our judgment be guided so far as the law permits by the spirit of freedom and tolerance in which our nation was founded, and by a desire to secure the blessings of liberty in thought and action to all those upon whom the right of American citizenship has been conferred by statute, as well as to the native born. And we certainly should presume that Congress was motivated by these lofty principles.
“We are directly concerned only with the rights of this petitioner and the circumstances surrounding his naturalization, but we should not overlook the fact that we are a heterogeneous people. In some of our larger cities a majority of the school children are the offspring of parents only one generation, if that far, removed from the steerage of the immigrant ship, children of those who sought refuge in the new world from the cruelty and oppression of the old, where men have been burned at the stake, imprisoned, and driven into exile in countless numbers for their political and religious beliefs. Here they have hoped to achieve a political status as citizens in a free world in which men are privileged to think and act and speak according to their convictions, without fear of punishment or further exile so long as they keep the peace and obey the law.”
The petitioner — depending upon one’s viewpoint — is one of the famous or infamous “ Fort Worth Five,” who are imprisoned for contempt in Texas. Their plight has not only engendered considerable comment in the news media, but has also prompted congressional concern. One distinguished Senator and several Congressmen and Congresswomen have made public statements or participated in legislative inquiries on the fate of these men.
While presiding at a Special Term for Naturalization of the Supreme Court of the State of New York, held in and for the County of Rockland, on March 9, 1973, Paul O’Dwyer, Esq., appeared before me on behalf of the petitioner, Matthias *1075 Reilly, t<3 oppose the application. by the Immigration and Naturalization Service of the United States Department of Justice (Naturalization Service) that the final hearing on the petitioner’s petition for naturalization as a citizen of the United States of America be “ adjourned without date.”
It appears that shortly before the scheduled date for the naturalization ceremonies, the Clerk of the court was directed by the Examiner bf the Naturalization Service to strike the names of both Matthias Reilly and his wife, Mary Reilly, from the listings on the court’s calendar of petitioners whose applications for citizenship had been approved and to whom the oath was to be administered. The petitioner had previously been advised by the Naturalization Service in a letter addressed to him at his home to appear in court On that day and was further informed that; “ If the Judge finds you qualified for naturalization, you will be sworn in as a citizen.” Thereafter, the Naturalization Service reconsidered its action, allegedly prompted by “ State and Federal Representatives ”, with respect to Mary Reilly for her name was re-inscribed and she was duly admitted to citizenship upon her taking the requisite oath together with all the other applicants.
In Open court, counsel for the petitioner protested the omission of the name of Matthias Reilly. After presenting a brief but impassioned version of the facts and circumstances, he moved that the petitioner’s petition “ be restored to Your Honor’s calendar forthwith.” In opposition, Marvin Stang, Esq., the agency’s Examiner, advised the court that the “ case had not been closed ” and “ since Mr. Reilly is not here at the present time that his application be adjourned without date.” I reserved decision on the petitioner’s motion and the Naturalization Service’s cross motion.
In the interim, petitioner has moved for an order directing that the Department of Justice, Bureau of Naturalization, produce its complete file and that it “ produce the body of Matthias Reilly on a day certain to be fixed by the court.” In the supporting affidavit, there is an additional request for further relief, to wit: that the court order the petitioner to be transferred to a Federal detention center closer to his home and that of his family which is in Rockland County, New York.
From the limited facts contained in the submissions, it appears that the petitioner was born on January 5, 1941, in County Fermanagh, which is in Northern Ireland — a fact not without current significance — and that he entered the United States on February 10, 1962. It further appears that his wife, *1076 nee Mary McHugh, also of County Fermanagh, and the petitioner were married on September 14, 1963. There are three infant children of the marriage, all born in the United States.
In the petitioner’s presentation, it is stated that the only organization to which he has belonged is the Ancient Order of Hibernians which he joined in 1964, some two years after his entry into the United States. Gainfully employed as a bus driver since 1965, the petitioner’s profile, as further outlined by his counsel, shows ownership of a home with a “heavy mortgage.”
The petitioner’s failure to appear at the naturalization ceremony or, to employ the statutory language, at the “final hearing,” is quite understandable: he has been confined in a civil jail in Texas for contempt since June 19, 1972. Save for a brief period in September of 1972, during which he was granted bail by United States Supreme Court Justice William 0. Douglas, he has been so incarcerated to date. On January 22, 1973, the United States Supreme Court denied certiorari, with Justice Douglas dissenting, and one:;week thereafter, the petitioner was returned to jail. It is further asserted by his counsel that he is destined to remain in prison until November 2, 1973, when that Grand Jury’s term expires.
Ordinarily, the role of a New York State Supreme Court Justice, presiding at a Special Term for Naturalization is largely ceremonial. Customarily, the occasion is attended by representatives from various patriotic and civic groups. During my years on the Bench, the only unusual ^incident I can recall was that of a pacifist to whom the appropriate oath had to be administered separately. I say this by way of preface since the issues presented now compel a review of the pertinent constitutional arid statutory authorities as a predicate for determining jurisdiction and disposition.
However ritualistic the final hearing may have evolved, nevertheless, it is not without judicial significance. In Matter of Murra (166 F. 2d 605, 606-607), the Seventh Circuit Court of Appeals in reversing the District Court’s denial of citizenship, after considering rules 52 and 81 (subd. [a], par. [2]) of the Federal Rules of Civil Procedure (U. S. Code, tit. 28, Appendix), concluded: “It thus appears that there are two ways in which a petition for naturalization may be disposed of: (1) the court may act upon the report of an Examiner who has conducted a preliminary hearing and who is required to make .findings upon which Ms recommendation is predicated; and *1077 (2) a hearing in open court where the witnesses must he examined before the court and in the presence of the court. It should be observed that this hearing before the court is not a discretionary matter but must be had in all cases ‘ upon demand of the petitioner.’ Thus, the hearing before the court is not for the purpose of reviewing the recommendations of the Examiner; it is a hearing de novo and it is obvious that the court must decide the issues upon the testimony which it hears, and that neither the testimony heard by the Examiner, his findings, nor his recommendation are of any consequence.”
A very brief analysis of section 1421 et seq. of title 8 of the United States Code — Nationality through Naturalization— reveals that section 1421 confers jurisdiction to naturalize upon the New York State Supreme Court by virtue of its being a court of record and having jurisdiction in actions at law and equity. Sections 1424 and 1425 bar subversives and deserters, respectively, from naturalization, and section 1426 disqualifies those aliens who have been relieved of military service. Subdivision (e) of section 1427 imposes upon the petitioner “ the burden of establishing good moral character ”, and subdivision (f) thereof denies naturalization to one who is an adherent of an organization against whom registration proceedings are pending for registration as subversive. Under section 1429, the burden of proof is imposed upon the petitioner to show that “he entered the United States lawfully and it then proceeds to bar naturalization to any person “ against whom there is outstanding a final finding of deportability pursuant to a warrant of arrest ”, i.e., a Federal warrant. Similarly, if there are deportation proceedings, pursuant to a warrant of arrest pending against the applicant, that, too, precludes naturalization.
Of more immediate pertinency, subdivision (a) of section 1447 provides for the examination of “the petitioner and the witnesses ” in “ open court.” Further in subdivision (b), the court “in its discretion” and “ shall, upon demand of the petitioner, require the examination of the petitioner and the witnesses under oath before the court and in the presence of the court.” (Emphasis supplied).
I have examined the various applicable statutes and decisional law; I, however, find no authority to deny citizenship merely because the petitioner has invoked the Fifth Amendment. On the contrary, the only authority I have been able to find holds otherwise. In Matter of Burke (335 F. Supp. 563, 565 [1971]), the United States District Court for the Northern District of *1078 Illinois, held that a petitioner could not be denied citizenship primarily on the ground that she refused to testify before the -House Un-American Activities Committee having invoked her constitutional privilege against self incrimination. In overruling the Hearing Examiner’s report, that court states: “ Weighed against this is the one fault found by the Immigration and Naturalization Service, that Mrs. Burke refused to testify before HUAC in 1965. She testified at the hearing that she relied upon the advice of her counsel in refusing to testify, and that even though her evidence would not tend to incriminate her, she nevertheless believed that she had the right to remain silent under the First and Fifth Amendments. Perhaps she was mistaken about that right. For present purposes, the issue need not be decided. The important point is that the constitutional guarantee against self-incrimination is not lightly to be waived, particularly when there are circumstances in which the waiver might be coerced. See, e. g., Spevack v. Klein, 385 U. S. 511 * * * (1967); Garrity v. New Jersey, 385 U. S. 493 * * * (1967).”
Granted that in Burke (supra, p. 566), that court noted that the petitioner had never been held “in contempt”; in my opinion, this distinction does not warrant distinguishing it from the matter at bar.
The source of naturalization is contained in the fourth paragraph of section 8 of article I of the United States Constitution, which authorizes Congress “to establish an uniform Buie of Naturalization”. From this it follows that “we may assume that naturalization is a privilege, to be given or withheld on such condition as Congress sees fit.” (Schneiderman v. United States, 320 U. S. 118, 131, supra).
It is to be noted that the section 1421 et seq. of title 8 of the United States Code set forth the congressional standards and prerequisites for .the naturalization of aliens. The Immigration and Naturalization Service as well as its predecessors, it thus follows, may only promulgate rules and regulations, substantive or procedural, which conform to the express statutory criteria enacted by Congress. Consequently, the Naturalization Service may not, under the guise of conducting an “investigation” imposo its views and precepts as to “ character and attachment to the principles of the Constitution.”
A naturalization proceeding is a “case” or “proceeding” and an order granting or denying naturalization is a “final decision,” hence appealable (Stasiukevich v. Nicolls, 168 F. *1079 2d 474). An alien has an absolute right if he has complied with the statutory requirements for filing to have his petition heard and his rights for naturalization determined; and it was so held despite there being an outstanding “warrant of deportation.” (Klig v. Watkins, 84 F. Supp. 486, 487).
It. should further be noted that it is for the court, not the administrative agency, to make “findings of fact ” respecting a petitioner’s status. Significantly, this latter observation is embodied in both the prevailing and dissenting opinions in Schneiderman (supra).
There is yet a further inescapable limitation. If, as has been held repeatedly, courts cannot overthrow or disregard the statutory provisions enacted by Congress — and these date from the initial Naturalization Act of the year 1795 — the Naturalization Service cannot stultify or bar a court at the inception of the judicial naturalization proceeding from acting upon a petition after it has been duly approved by the said bureau; and, surely, not by its own fiat in revoking unilaterally its approval by merely striking petitioner’s name from a court’s calendar.
To grant the request of the Naturalization Service for an “ adjournment without date ” is to relegate the petitioner to limbo. The Naturalization Service is an investigatory agency and under administrative law its functions are to investigate and to report — not to determine — for the latter is a judicial function. To adjourn indefinitely and presumably only to be revived at the instance of the Naturalization Service, under the circumstances, encroaches upon the judicial prerogative.
I am confronted with a most extraordinary situation for the gravamen of the Government’s objection to granting citizenship to Matthias Reilly is that he has invoked his constitutional privilege, under the Fifth Amendment, to refuse to incriminate himself. Despite his present status and situation, the petitioner has as much right to the privileges and immunities of the Constitution as if he were “ to the manor born ” or had already been annointed with citizenship. The only exceptions are electoral franchise, standing for election and traveling abroad (Harisiades v. Shaughnessy, 342 U. S. 580, 586, ns. 9 and 10). If there are criminal proceedings against him, he must be accorded the protection of the Fifth and Sixth Amendments (see, also, Coleman v. McGrath, 342 U. S. 580, rehearing den. 343 U. S. 936).
The Naturalization Service, in a letter addressed to the court, by its Assistant District Director for Citizenship, dated *1080 March 12, 1973, concedes'that “ after a favorable recommendation ” had been made “ and notice to appear for final hearing was given to petitioner ” that only then did it become aware that “ the petitioner was presently incarcerated for civil contempt for failure to testify before a Grand Jury after a grant of immunity.” The letter then continues to speak of “ his [Matthias Reilly’s] possible involvement in gun smuggling.” It is then urged that ‘ ‘ although he has not been indicted in this matter, the possibility of charges being filed against him growing out of these facts exists” and that “the circumstances alluded to raise questions of the petitioner’s eligibility for naturalization on grounds of character and attachment to the principles of the Constitution.”
The Government’s position as outlined in the said communication disregards yet another of our most fundamental liberties: the presumption of innocence. Whether Matthias Reilly, ultimately, will or will not be indicted is presently grossly irrelevant for he is now cloaked with the mantle of innocence of any substantive crime; and this is so despite his being in jail.
As I have previously noted, what is denominated statutorily as a “final hearing” has evolved into a ceremonial occasion — and rightfully so. I note that on the naturalization calendar presented to me that day for the naturalization ceremony some 49 names were listed, together with their former nationalities, some 24 in number. Among those invited to participate were the elected and appointed officials of Rockland County, the American Legion of Rockland County, Veterans of Foreign Wars, Military Order of Purple Heart, Jewish War Veterans, Marine Corps League and Rockland County Amvets. Additionally, among the invitees who appeared by designated representatives were the Daughters of the American Revolution, the Sons of the American Revolution and Girl Scout Troop No. 51. I might also add that at the naturalization ceremonies, the Sheriff and District Attorney of Rockland County were present.
In Schneiderman v. Untied States (320 U. S. 118, 122-123, supra) Mr. Justice Murphy does speak of naturalization as a “privilege,” but (pp. 131-132) by the Constitution it is: “to be given or withheld on such conditions as Congress sees fit. Cf. United States v. Macintosh, 283 U. S. 605, 615, and the dissenting opinion of Chief Justice Hughes, ibid, at p. 627. See also Tutun v. United States, 270 U. S. 568, 578; Turner v. Williams, 194 U. S. 279. But because of our firmly rooted tradition of freedom of belief, we certainly will not presume in *1081 construing the naturalization and denaturalization acts that Congress meant to circumscribe liberty of political thought by general phrases in those statutes. As Chief Justice Hughes' said in dissent in the Macintosh case, such general phrases ‘ should he construed, not in opposition to, hut in accord with, the theory and practice of our Government in relation to freedom of conscience. ’ 283 U.S. at 635. See also Holmes, J., dissenting in United States v. Schwimmer, 279 U.S. 644, 653-55.”
Significantly, the Government in its letter of March 12, 1973, endeavors to justify its withdrawing approval by adverting to the phrase “ on grounds of character and attachment to the principles of the Constitution.” In that connection, the above-quoted language from the dissent by Chief Justice Hughes in United States v. Macintosh (283 U. S. 605, 635) is particularly apposite.
I quote further from Schneiderman (supra, p. 139): “ Our concern is with what Congress meant to be the extent of the area of allowable thought under the statute. By the very generality of the terms employed it is evident that Congress intended an elastic test, one which should not be circumscribed by attempts at precise definition. In view of our tradition of freedom of thought, it is not to he presumed that Congress in the Act of 1906, or its predecessors of 1795 and 1802, intended to offer naturalization only to those' whose political views coincide with those considered best by the founders in 1787 or by the majority in this country today. Especially is this so since the language used, posing the general test of 1 attachment ’ is not necessarily susceptible of so repressive a construction.”
As for the role of the Naturalization Service in such proceedings, Mr. Justice Douglas noted in the concurring opinion in Schneiderman (p. 163): “ It is of course true that an applicant for citizenship was required to come forward and make the showing necessary for the required findings. § 4. But under this earlier Act, it was not that showing but the finding of the court which Congress expressed in the form of a condition. If § 15 should be broadened by judicial construction to permit the findings of attachment to be set aside for reasons other than fraud, then the issue of illegality would be made to turn not on the judge being satisfied as to the applicant’s attachment but on the evidence underlying that finding. Such a condition should not be readily implied.”
Interestingly, Justice Douglas quotes the very language of Chief Justice Hughes in his dissenting opinion in United States v. Macintosh (supra).
*1082 Mr. Justice Butledge (p. 167) in another concurring opinion in Schneider man, although concerned with canceling citizenship, too, spoke of the limitations upon the Government — and, yes, the courts themselves — in denying citizenship to an alien: “No citizen with such a threat hanging over his head could be free. If he belonged to ‘ off-color ’ organizations or held too radical or, perhaps, too reactionary views, for some segment of the judicial palate, when his admission took place, he could not open his mouth without fear his words would be held against him. For whatever he might say or whatever any such organization might advocate could be hauled forth at any time to show ‘ continuity ’ of belief from the day of his admission, or ‘ concealment ’ at that time. Such a citizen would not be admitted to liberty. His best course would be silence or hypocrisy. This is not citizenship. Nor is it adjudication.”
Mr. Justice Brandéis, speaking for an unanimous court in Tutun v. United States (270 U. S. 568, 576), firstly noted the historic role of the courts in naturalization: ‘ ‘ The function of admitting to citizenship has been conferred exclusively upon courts continuously since the foundation of our Government. See Act of March 26,1790, c. 3,1 Stat. 103. The federal district courts, among others, have performed that function since the Act of January 29,1795, c. 20,1 Stat. 414. The constitutionality of this exercise of jurisdiction has never been questioned. If the proceeding were not a case or controversy within the meaning of art. Ill, § 2, this delegation of power upon the courts would have been invalid. Hayburn’s Case, 2 Dall. 409; United States v. Ferreira, 13 How. 40; Muskrat v. United States, 219 U. S. 346.”
Thereafter, the following language in Tutun (supra, p. 578) is of particular import to the instant proceeding: ‘ ‘ The opportunity to become a citizen of the United States is said to be merely a privilege and not a right. It is true that the Constitution does not confer upon aliens the right to naturalization. But it authorizes Congress to establish a uniform rule therefor. Art. I, § 8, cl. 4. The opportunity having been conferred by the Naturalization Act, there is a statutory right in the alien to submit his petition and evidence to a court, to have that tribunal pass upon them, and, if the requisite facts are established, to receive the certificate. See United States v. Shanahan, 232 F. 169, 171. There is, of course, no ‘ right to naturalization unless all statutory requirements are complied with.’ United States v. Ginsberg, 243 U. S. 472, 475; Luria v. United States, 231 U. S. 9, 22. The applicant for citizenship, *1083 like other suitors who institute proceedings in a court of justice to secure the determination of an asserted right, must allege in his petition the fulfillment of all conditions upon the existence of which the alleged right is made dependent, and he must establish these allegations by competent evidence to the satisfaction of the court. In re Bodek, 63 Fed. 813, 814, 815; in re an Alien, 7 Hill (N. Y.) 137. In passing upon the application the court exercises judicial judgment. It does not confer or withhold á favor.”
Professor Milton It. Konvitz in his text, Civil Eights in Immigration [Cornell Univ. Press, 1953], pp. 142-143 states: 11 The Constitution authorizes Congress to establish a uniform rule of naturalization, but this power of Congress, the Supreme Court has said, ‘ is not trammeled, and it may grant or withhold the privilege of naturalization upon any grounds or without any reason as it sees fit.’ Thus, with regard to naturalization, as with immigration and deportation, Congress is omnicompetent. But while the Constitution does not confer upon aliens the right to naturalization, once Congress enacts a statute ‘ there is a statutory right in the alien to submit his petition and evidence to a court, to have that tribunal pass upon them, and, if the requisite facts are established, to receive the certificate * * * There is, of course, no ‘ right to naturali-
zation unless all statutory requirements are complied with.’” (Citations omitted).
Eespecting the immediate issue as to the court’s power to grant an indefinite continuance in a final hearing, Judge Pabkeb, in Schwab v. Coleman (145 F. 2d 672, 677) ruling for the Fourth Circuit, Circuit Court of Appeals, overruled such determination by the District Court, holding expressly that the lower court could not continue the matter indefinitely: “We do not think that their right to such review can be defeated by continuing the hearing of the petitions over their protest. A continuance may, of course, be granted in naturalization cases as well as in others, and whether or not such continuance shall be granted is ordinarily a matter resting in the court’s discretion; but the discretion thus vested in the court is a sound, not an arbitrary, discretion; and it may not be exercised in such way as to result in the denial of the right of review to which a party is entitled.”
There is yet a further aspect which is noted in Schivab: to adjourn without date the naturalization proceeding is to deny the petitioner a right to appeal. That opinion notes (p. 678): ‘ ‘ Whether petitioners were entitled to naturalization or not, they were, at least, entitled to have their petitions passed upon *1084 so that they might appeal from an adverse decision to this court; and the continuance over their protest did not lie within the limits of judicial discretion as to granting continuances but amounted to a refusal to exercise power which petitioners had a right to have exercised. 35 Am. Jur. pp. 25, 26.”
The Naturalization Service stresses that in the event naturalization is granted and should the petitioner be subsequently convicted of a crime, it would impose a more onerous burden of proof to cancel citizenship than is required to deny naturalization. I am not impressed by that argument for if, indeed, the petitioner is ultimately convicted of such grievous crime, it should impose no undue burden upon the Naturalization Service to succeed in a revocation proceeding.
In any event, there intervene the petitioner’s statutory rights for as previously noted, subdivision (b) of section 1447 mandates a judicial hearing upon “ demand of the petitioner”.
The application by the Immigration and Naturalization Service for a continuance without date is denied. I find no authority for the Government to leave the petitioner in his present amorphous state, resolvable solely at its caprice. So ruling, however, is of dubious solace to the petitioner since hie actual physical presence is a condition precedent to consummate naturalization. In United States v. Ginsberg (243 U. S. 472, 474) the United States Supreme Court held that the Naturalization Act “requires a final hearing upon the petition in open court ” and that it does not suffice to conduct such hearing in Chambers. Nevertheless, I have been informed that in the United States District Court for the Southern District, present most compelling circumstances, such as petitioner being in extremis or hospitalized, a District Court Judge may conduct a final hearing at such institution. My jurisdiction, however, is limited to the State of New York; I am functus officio without the State. I have been assigned to the Supreme Court, Westchester County, for the May 1973 Term; consequently, I am setting down the final hearing on the petitioner’s petition for naturalization for 10:00 a.m., on May 22, 1973, at the County Court House, White Plains, New York. Whether the Immigration and Naturalization Service will use its good offices to arrange for the petitioner to be present thereat is for it to decide.
Alternatively, the Naturalization Service might consider resorting to section 337.11 of its own rules and regulations — “ Oath to Renunciation and Allegiance: Sickness or Disability of Petitioner ” — and deem Reilly’s incarceration as such *1085 “ other disability to take the oath of allegiance in open court ” to the end of advising ‘ ‘ the naturalization court for the purpose of aiding the court to determine whether the oath may be taken at another place.”
Respecting the petitioner’s application for the further relief previously noted, the several applications are denied. I find no basis for directing the Bureau of Naturalization to produce its complete file; nor do I see any basis for converting this naturalization proceeding into a variant form of habeas corpus as a predicate for ordering that the petitioner be transferred to a Federal prison closer to his home. As for the request that I direct that the petitioner be produced on a day certain, the foregoing disposition, however hortatory, is the only partial relief I can provide.
I am constrained to note that the Immigration and Naturalization Service apparently is content to limit its opposition to its brief letter of March 12,1973, which I have previously discussed.